# EDELMAN, DIRECTOR, DEPARTMENT OF PUBLIC AID OF ILLINOIS v. JORDAN

No. 72–1410.   Argued December 12, 1973—Decided March 25, 1974

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, and POWELL, JJ., joined. DOUGLAS, J., *post*, p. 678, and BRENNAN, J., *post*, p. 687, filed dissenting opinions. MARSHALL, J., filed a dissenting opinion, in which BLACKMUN, J., joined, *post*, p. 688.

*Robert J. O'Rourke,* Deputy Attorney General of Illinois, argued the cause for petitioner. On the briefs were *William J. Scott,* Attorney General, and *Donald S. Carnow,* Special Assistant Attorney General.

*Sheldon Roodman* argued the cause and filed a brief for respondent.*

---

*Briefs of *amici curiae* urging affirmance were filed by *Jack Greenberg, Charles Stephen Ralston,* and *Eric Schnapper* for the NAACP Legal Defense and Educational Fund, Inc., and by *Nancy Duff Levy* and *Henry A. Freedman* for the NLSP Center on Social Welfare Policy and Law, Inc.

Mr. Justice Rehnquist delivered the opinion of the Court.

Respondent John Jordan filed a complaint in the United States District Court for the Northern District of Illinois, individually and as a representative of a class, seeking declaratory and injunctive relief against two former directors of the Illinois Department of Public Aid, the director of the Cook County Department of Public Aid, and the comptroller of Cook County. Respondent alleged that these state officials were administering the federal-state programs of Aid to the Aged, Blind, or Disabled (AABD) in a manner inconsistent with various federal regulations and with the Fourteenth Amendment to the Constitution.[1]

AABD is one of the categorical aid programs administered by the Illinois Department of Public Aid pursuant to the Illinois Public Aid Code, Ill. Rev. Stat., c. 23, §§ 3–1 through 3–12 (1973). Under the Social Security Act, the program is funded by the State and the Federal Governments. 42 U. S. C. §§ 1381–1385.[2] The Department of Health, Education, and Welfare (HEW),

---

[1] In his complaint in the District Court, respondent claimed that the Illinois Department of Public Aid was not complying with federal regulations in its processing of public aid applications, and also that its refusal to process and allow respondent's claim for a period of four months, while processing and allowing the claims of those similarly situated, violated the Equal Protection Clause of the Fourteenth Amendment. Respondent asserted that the District Court could exercise jurisdiction over the cause by virtue of 28 U. S. C. §§ 1331 and 1343 (3) and (4). Though not briefed by the parties before this Court, we think that under our decision in *Hagans* v. *Lavine, ante,* p. 528, the equal protection claim cannot be said to be "wholly insubstantial," and that therefore the District Court was correct in exercising pendent jurisdiction over the statutory claim.

[2] Effective January 1, 1974, this AABD program was replaced by a similar program. See 42 U. S. C. §§ 801–805 (1970 ed., Supp. II).

which administers these payments for the Federal Government, issued regulations prescribing maximum permissible time standards within which States participating in the program had to process AABD applications. Those regulations, originally issued in 1968, required, at the time of the institution of this suit, that eligibility determinations must be made by the States within 30 days of receipt of applications for aid to the aged and blind, and within 45 days of receipt of applications for aid to the disabled. For those persons found eligible, the assistance check was required to be received by them within the applicable time period. 45 CFR § 206.10 (a)(3).[3]

---

[3] Title 45 CFR § 206.10 (a)(3) (1973) provides in pertinent part: "(a) *State plan requirements.* A State plan . . . shall provide that:

. . . . .

"(3) A decision shall be made promptly on applications, pursuant to reasonable State-established time standards not in excess of:
"(i) 45 days [for aid to aged and blind] . . . ; and
"(ii) 60 days . . . [for aid to disabled]. Under this requirement, the applicant is informed of the agency's time standard in acting on applications, which covers the time from date of application under the State plan to the date that the assistance check, or notification of denial of assistance or change of award, or the eligibility decision with respect to medical assistance, is mailed to the applicant or recipient. . . ."
When originally issued in 1968 the regulations provided that the applications for aid to the aged and blind be processed within 30 days and that aid to the disabled be processed within 45 days of receipt. They also provided that the person determined to be eligible must *receive* his assistance check within the applicable time period. The amendment to 60 days for aid to the disabled occurred in 1971, as did the change to require mailing instead of receipt of the assistance check within the applicable time period; effective Oct. 15, 1973, the time for processing aged and blind applications became 45 days.
In addition, at the time of institution of the suit, 45 CFR § 206.10 (a)(6) (1972) provided in pertinent part:

During the period in which the federal regulations went into effect, Illinois public aid officials were administering the benefits pursuant to their own regulations as provided in the Categorical Assistance Manual of the Illinois Department of Public Aid.[4] Respondent's complaint charged that the Illinois defendants, operating under those regulations, were improperly authorizing grants to commence only with the month in which an application was approved and not including prior eligibility months for which an applicant was entitled to aid under federal law. The complaint also alleged that the Illinois defendants were not processing the applications within the applicable time requirements of the federal regulations; specifically, respondent alleged that his own application

---

"(6) Entitlement will begin as specified in the State plan, which (i) for financial assistance must be no later than the date of authorization of payment . . . ."

[4] The Illinois regulations, found in the Illinois Categorical Assistance Manual of the Illinois Department of Public Aid, provide in pertinent part:

"4004.1

"Except for [disability] cases which have a time standard of 45 days, the time standard for disposition of applications is 30 days from the date of application to the date the applicants are determined eligible and the effective date of their first assistance or are determined ineligible and receive a notice of denial of assistance. . . .

"8255. Initial Awards

"Initial awards may be new grants, reinstatements, or certain types of resumptions. They can be effective for the month in which Form FO–550 is signed but for no prior period except [under conditions not relevant to this case].

"8255.1 New Grants

"A new grant is the first grant authorized after an application has been accepted in a case which has not previously received assistance under the same assistance program. It may be authorized for the month in which Form FO–550 is signed but not for any prior period unless it meets [exceptions not relevant to this case]."

for disability benefits was not acted on by the Illlinois Department of Public Aid for almost four months. Such actions of the Illinois officials were alleged to violate federal law and deny the equal protection of the laws. Respondent's prayer requested declaratory and injunctive relief, and specifically requested "a permanent injunction enjoining the defendants to award to the entire class of plaintiffs all AABD benefits wrongfully withheld."

In its judgment of March 15, 1972, the District Court declared § 4004 of the Illinois Manual to be invalid insofar as it was inconsistent with the federal regulations found in 45 CFR § 206.10 (a)(3), and granted a permanent injunction requiring compliance with the federal time limits for processing and paying AABD applicants. The District Court, in paragraph 5 of its judgment, also ordered the state officials to "release and remit AABD benefits wrongfully withheld to all applicants for AABD in the State of Illinois who applied between July 1, 1968 [the date of the federal regulations] and April 16, 197[1] [the date of the preliminary injunction issued by the District Court] and were determined eligible . . . ."[5]

_____

[5] Paragraph 5 of the District Court's judgment provided:

"That the defendant EDWARD T. WEAVER, Director, Illinois Department of Public Aid, his agents, including all of the County Departments of Public Aid in the State of Illinois, and employees, and all persons in active concert and participation with them, are hereby enjoined to release and remit AABD benefits wrongfully withheld to all applicants for AABD in the State of Illlinois who applied between July 1, 1968 and April 16, 1972 [sic] [should read "1971"], and were determined eligible, as follows:

"(a) For those aged and blind applicants whose first full AABD check was not mailed within thirty days from the date of application, AABD assistance for the period beginning with the thirtieth day from the date of application to the date the applicant's entitlement to AABD became effective;

"(b)(i) For those disabled applicants who applied between July 1, 1968 and December 31, 1970, whose first full AABD check was not

On appeal to the United States Court of Appeals for the Seventh Circuit, the Illinois officials contended, *inter alia,* that the Eleventh Amendment barred the award of

---

mailed within forty-five days from the date of application, AABD assistance for the period beginning with the forty-fifth day from the date of application to the date the applicant's entitlement became effective;

"(ii) For those disabled applicants who applied between January 1, 1971 and April 16, 1971, whose first full AABD check was not mailed within sixty days from the date of application, AABD assistance for the period beginning with the sixtieth day from the date of application to the date the applicant's entitlement became effective.

"These AABD benefits shall be mailed to those persons currently receiving AABD within eight months with an explanatory letter, said letter having been first approved by plaintiffs' attorney. Any AABD benefits received pursuant to this paragraph shall not be deemed income or resources under Article III of the Illinois Public Aid Code.

"For those persons not presently receiving AABD:

"(a) A certified letter (return receipt requested), said letter having been first approved by plaintiffs' attorney, shall be sent to the last known address of the person, informing him in concise and easily understandable terms that he is entitled to a specified amount of AABD benefits wrongfully withheld, and that he may claim such amount by contacting the County Department of Public Aid at a specified address, within 45 days from the receipt of said letter.

"(b) If the County Department of Public Aid does not receive a claim for the AABD benefits within 45 days from the date of actual notice to the person, the right to said AABD benefits shall be forfeited and the file shall be closed. Persons who do not receive actual notice do not forfeit their rights to AABD benefits wrongfully withheld under this provision."

Paragraph 6 of the District Court's judgment provided:

"Within 15 days from the date of this decree, defendant EDWARD T. WEAVER, Director, Illlinois Department of Public Aid, shall submit to the court and the plaintiffs' attorney a detailed statement as to the method for effectuating the relief required by paragraph 5, supra, of this Decree. Any disputes between the parties as to whether the procedures and steps outlined by the

retroactive benefits, that the judgment of inconsistency between the federal regulations and the provisions of the Illinois Categorical Assistance Manual could be given prospective effect only, and that the federal regulations in question were inconsistent with the Social Security Act itself. The Court of Appeals rejected these contentions and affirmed the judgment of the District Court. *Jordan* v. *Weaver,* 472 F. 2d 985 (1973).[6] Because of an apparent conflict on the Eleventh Amendment issue with the decision of the Court of Appeals for the Second Circuit in *Rothstein* v. *Wyman,* 467 F. 2d 226 (1972), cert. denied, 411 U. S. 921 (1973), we granted the petition for certiorari filed by petitioner Joel Edelman, who is the present Director of the Illinois Department of Public Aid, and successor to the former directors sued below. 412 U. S. 937 (1973). The petition for certiorari raised the same contentions urged by the petitioner in the Court of Appeals.[7] Because we believe the Court of Appeals

---

defendant WEAVER will fulfill the requirements of this Decree will be resolved by the Court."

On July 19, 1973, the author of this opinion stayed until further order of this Court these two paragraphs of the District Court's judgment. 414 U. S. 1301.

[6] Respondent appealed from the District Court's judgment insofar as it held him not entitled to receive benefits from the date of his applications (as opposed to the date of authorization of benefits as provided by the federal regulations) and insofar as it failed to award punitive damages. The Court of Appeals upheld the District Court's decision against respondent on those points and they are not at issue here. 472 F. 2d 985, 997–999.

[7] Citing *Chevron Oil Co.* v. *Huson,* 404 U. S. 97 (1971), petitioner also contends in this Court that the Court of Appeals erred in refusing to give the District Court's judgment prospective effect only. Brief for Petitioner 37, incorporating arguments made in Pet. for Cert. 18–22. The Court of Appeals concluded that this ground was "not presented to the district judge before the entry of judgment, so that it comes too late." 472 F. 2d, at 995. The Court of Appeals went on, however, to conclude that "[e]ven if the

erred in its disposition of the Eleventh Amendment claim, we reverse that portion of the Court of Appeals decision which affirmed the District Court's order that retroactive benefits be paid by the Illinois state officials.[8]

---

ground had been timely presented, defendants' contention would be meritless." *Ibid.* Noting that one of three tests established by our decision in *Huson* for determining the retroactivity of court decisions was that "the decision to be applied nonretroactively *must* establish a new principle of law, either by overruling clear past precedent on which litigants may have relied . . . or [have decided] an issue of first impression whose resolution was not clearly foreshadowed . . . ," *Chevron Oil Co.* v. *Huson, supra,* at 106, the Court of Appeals found that the petitioner had not satisfied this test, since the "federal time requirements for processing applications and paying eligible AABD applicants were made effective July 1, 1968, and defendants were well aware of these mandatory maximum permissible time standards." 472 F. 2d, at 996.

In light of our disposition of this case on the Eleventh Amendment issue we see no reason to address this contention.

[8] Former Title 42 U. S. C. § 1382 (a) (8) provided in pertinent part:

"(a) Contents.

"A State plan for aid to the aged, blind, or disabled, or for aid to the aged, blind, or disabled and medical assistance for the aged, must—

.  .  .  .  .

"(8) provide that all individuals wishing to make application for aid or assistance under the plan shall have opportunity to do so, and that such aid or assistance shall be furnished with reasonable promptness to all eligible individuals."

HEW, pursuant to authority granted to it by 42 U. S. C. § 1302, has promulgated regulations, see n. 3, *supra,* which require that decisions be made promptly on applications within 45 days for the aged and blind and within 60 days for the disabled, and that initiation of payments to the eligible be made within the same periods. Petitioner renews in this Court the contention made in the Court of Appeals that these time limitations in the regulations are inconsistent with the statute and therefore an unlawful abuse of the rule-making authority. Brief for Petitioner 37, incorporating arguments made in Pet. for Cert. 22–28. Specifically, petitioner argues

The historical basis of the Eleventh Amendment has been oft stated, and it represents one of the more dramatic examples of this Court's effort to derive meaning from the document given to the Nation by the Framers nearly 200 years ago. A leading historian of the Court tells us:

> "The right of the Federal Judiciary to summon a State as defendant and to adjudicate its rights and liabilities had been the subject of deep apprehension and of active debate at the time of the adoption of the Constitution; but the existence of any such right had been disclaimed by many of the most eminent advocates of the new Federal Government, and it was largely owing to their successful dissipation of the fear of the existence of such Federal power that the Constitution was finally adopted." 1 C. Warren, The Supreme Court in United States History 91 (rev. ed. 1937).

Despite such disclaimers,[9] the very first suit entered

---

that the "establishment of arbitrary [forty-five] and sixty day maximums in the HEW regulations for determination of eligibility and initiation of payments without taking into consideration the efficient administration of the Act by the State agencies is inconsistent with the 'reasonable promptness' requirement and must therefore be declared unlawful . . . ." Pet. for Cert. 23. The Court of Appeals rejected this contention, holding that "these time requirements, binding on state welfare officials, are an appropriate interpretation of the Congressional mandate of 'reasonable promptness.'" 472 F. 2d, at 996. We agree with the Court of Appeals.

[9] While the debates of the Constitutional Convention themselves do not disclose a discussion of the question, the prevailing view at the time of the ratification of the Constitution was stated by various of the Framers in the writings and debates of the period. Examples of these views have been assembled by Mr. Chief Justice Hughes:

". . . Madison, in the Virginia Convention, answering objections to the ratification of the Constitution, clearly stated his view as to the purpose and effect of the provision conferring jurisdiction over

in this Court at its February Term in 1791 was brought against the State of Maryland by a firm of Dutch bankers as creditors. *Vanstophorst* v. *Maryland*, see 2 Dall.

controversies between States of the Union and foreign States. That purpose was suitably to provide for adjudication in such cases if consent should be given but not otherwise. Madison said: 'The next case provides for disputes between a foreign state and one of our states, should such a case ever arise; and between a citizen and a foreign citizen or subject. I do not conceive that any controversy can ever be decided, in these courts, between an American state and a foreign state, without the consent of the parties. If they consent, provision is here made.' 3 Elliot's Debates, 533.

"Marshall, in the same Convention, expressed a similar view. Replying to an objection as to the admissibility of a suit by a foreign state, Marshall said: 'He objects, in the next place, to its jurisdiction in controversies between a state and a foreign state. Suppose, says he, in such a suit, a foreign state is cast; will she be bound by the decision? If a foreign state brought a suit against the commonwealth of Virginia, would she not be barred from the claim if the federal judiciary thought it unjust? The previous consent of the parties is necessary; and, as the federal judiciary will decide, each party will acquiesce.' 3 Elliot's Debates, 557.

"Hamilton, in The Federalist, No. 81, made the following emphatic statement of the general principle of immunity: 'It is inherent in the nature of sovereignty not to be amenable to the suit of an individual *without its consent*. This is the general sense and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in the Union. Unless, therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the States, and the danger intimated must be merely ideal. The circumstances which are necessary to produce an alienation of State sovereignty were discussed in considering the article of taxation and need not be repeated here. A recurrence to the principles there established will satisfy us that there is no color to pretend that the State governments would by the adoption of that plan be divested of the privilege of paying their own debts in their own way, free from every constraint but that which flows from the obligations of good faith. The contracts between a nation and individuals are only binding on the conscience of the sovereign, and have no pretensions to a compulsive force. They confer no right of action

401 and Warren, *supra*, at 91 n. 1. The subsequent year brought the institution of additional suits against other States, and caused considerable alarm and consternation in the country.

The issue was squarely presented to the Court in a suit brought at the August 1792 Term by two citizens of South Carolina, executors of a British creditor, against the State of Georgia. After a year's postponement for preparation on the part of the State of Georgia, the Court, after argument, rendered in February 1793, its short-lived decision in *Chisholm* v. *Georgia,* 2 Dall. 419. The decision in that case, that a State was liable to suit by a citizen of another State or of a foreign country, literally shocked the Nation. Sentiment for passage of a constitutional amendment to override the decision rapidly gained momentum, and five years after *Chisholm* the Eleventh Amendment was officially announced by President John Adams. Unchanged since then, the Amendment provides:

> "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

While the Amendment by its terms does not bar suits against a State by its own citizens, this Court has con-

---

independent of the sovereign will. To what purpose would it be to authorize suits against States for the debts they owe? How could recoveries be enforced? It is evident it could not be done without waging war against the contracting State; and to ascribe to the federal courts by mere implication, and in destruction of a pre-existing right of the State governments, a power which would involve such a consequence would be altogether forced and unwarrantable.' " *Monaco* v. *Mississippi,* 292 U. S. 313, 323–325 (1934) (footnotes omitted).

sistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State. *Hans* v. *Louisiana,* 134 U. S. 1 (1890); *Duhne* v. *New Jersey,* 251 U. S. 311 (1920); *Great Northern Life Insurance Co.* v. *Read,* 322 U. S. 47 (1944); *Parden* v. *Terminal R. Co.,* 377 U. S. 184 (1964); *Employees* v. *Department of Public Health and Welfare,* 411 U. S. 279 (1973). It is also well established that even though a State is not named a party to the action, the suit may nonetheless be barred by the Eleventh Amendment. In *Ford Motor Co.* v. *Department of Treasury,* 323 U. S. 459 (1945), the Court said:

> "[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants." *Id.,* at 464.

Thus the rule has evolved that a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment. *Great Northern Life Insurance Co.* v. *Read, supra; Kennecott Copper Corp.* v. *State Tax Comm'n,* 327 U. S. 573 (1946).

The Court of Appeals in this case, while recognizing that the *Hans* line of cases permitted the State to raise the Eleventh Amendment as a defense to suit by its own citizens, nevertheless concluded that the Amendment did not bar the award of retroactive payments of the statutory benefits found to have been wrongfully withheld. The Court of Appeals held that the above-cited cases, when read in light of this Court's landmark decision in *Ex parte Young,* 209 U. S. 123 (1908), do not preclude

the grant of such a monetary award in the nature of equitable restitution.

Petitioner concedes that *Ex parte Young, supra,* is no bar to that part of the District Court's judgment that prospectively enjoined petitioner's predecessors from failing to process applications within the time limits established by the federal regulations. Petitioner argues, however, that *Ex parte Young* does not extend so far as to permit a suit which seeks the award of an accrued monetary liability which must be met from the general revenues of a State, absent consent or waiver by the State of its Eleventh Amendment immunity, and that therefore the award of retroactive benefits by the District Court was improper.

*Ex parte Young* was a watershed case in which this Court held that the Eleventh Amendment did not bar an action in the federal courts seeking to enjoin the Attorney General of Minnesota from enforcing a statute claimed to violate the Fourteenth Amendment of the United States Constitution. This holding has permitted the Civil War Amendments to the Constitution to serve as a sword, rather than merely as a shield, for those whom they were designed to protect. But the relief awarded in *Ex parte Young* was prospective only; the Attorney General of Minnesota was enjoined to conform his future conduct of that office to the requirement of the Fourteenth Amendment. Such relief is analogous to that awarded by the District Court in the prospective portion of its order under review in this case.

But the retroactive portion of the District Court's order here, which requires the payment of a very substantial amount of money which that court held should have been paid, but was not, stands on quite a different footing. These funds will obviously not be paid out of the pocket of petitioner Edelman. Addressing himself to a similar situation in *Rothstein* v. *Wyman,* 467 F. 2d 226

(CA2 1972), cert. denied, 411 U. S. 921 (1973), Judge McGowan [10] observed for the court:

> "It is not pretended that these payments are to come from the personal resources of these appellants. Appellees expressly contemplate that they will, rather, involve substantial expenditures from the public funds of the state. . . .
>
> "It is one thing to tell the Commissioner of Social Services that he must comply with the federal standards for the future if the state is to have the benefit of federal funds in the programs he administers. It is quite another thing to order the Commissioner to use state funds to make reparation for the past. The latter would appear to us to fall afoul of the Eleventh Amendment if that basic constitutional provision is to be conceived of as having any present force." 467 F. 2d, at 236–237 (footnotes omitted).

We agree with Judge McGowan's observations. The funds to satisfy the award in this case must inevitably come from the general revenues of the State of Illinois, and thus the award resembles far more closely the monetary award against the State itself, *Ford Motor Co.* v. *Department of Treasury, supra,* than it does the prospective injunctive relief awarded in *Ex parte Young.*

The Court of Appeals, in upholding the award in this case, held that it was permissible because it was in the form of "equitable restitution" instead of damages, and therefore capable of being tailored in such a way as to minimize disruptions of the state program of categorical assistance. But we must judge the award actually made in this case, and not one which might have been differently tailored in a different case, and we must judge

---

[10] Of the Court of Appeals for the District of Columbia Circuit, sitting by designation on the Court of Appeals for the Second Circuit.

it in the context of the important constitutional principle embodied in the Eleventh Amendment.[11]

We do not read *Ex parte Young* or subsequent holdings of this Court to indicate that any form of relief may be awarded against a state officer, no matter how closely it may in practice resemble a money judgment payable out of the state treasury, so long as the relief may be labeled "equitable" in nature. The Court's opinion in *Ex parte Young* hewed to no such line. Its citation of *Hagood* v. *Southern,* 117 U. S. 52 (1886), and *In re Ayers,* 123 U. S. 443 (1887), which were both actions

---

[11] It may be true, as stated by our Brother DOUGLAS in dissent, that "[m]ost welfare decisions by federal courts have a financial impact on the States." *Post,* at 680–681. But we cannot agree that such a financial impact is the same where a federal court applies *Ex parte Young* to grant prospective declaratory and injunctive relief, as opposed to an order of retroactive payments as was made in the instant case. It is not necessarily true that "[w]hether the decree is prospective only or requires payments for the weeks or months wrongfully skipped over by the state officials, the nature of the impact on the state treasury is precisely the same." *Post,* at 682. This argument neglects the fact that where the State has a definable allocation to be used in the payment of public aid benefits, and pursues a certain course of action such as the processing of applications within certain time periods as did Illinois here, the subsequent ordering by a federal court of retroactive payments to correct delays in such processing will invariably mean there is less money available for payments for the continuing obligations of the public aid system.

As stated by Judge McGowan in *Rothstein* v. *Wyman,* 467 F. 2d 226, 235 (CA2 1972):

"The second federal policy which might arguably be furthered by retroactive payments is the fundamental goal of congressional welfare legislation—the satisfaction of the ascertained needs of impoverished persons. Federal standards are designed to ensure that those needs are equitably met; and there may perhaps be cases in which the *prompt* payment of funds wrongfully withheld will serve that end. As time goes by, however, retroactive payments become compensatory rather than remedial; the coincidence between previously ascertained and existing needs becomes less clear."

against state officers for specific performance of a contract to which the State was a party, demonstrate that equitable relief may be barred by the Eleventh Amendment.

As in most areas of the law, the difference between the type of relief barred by the Eleventh Amendment and that permitted under *Ex parte Young* will not in many instances be that between day and night. The injunction issued in *Ex parte Young* was not totally without effect on the State's revenues, since the state law which the Attorney General was enjoined from enforcing provided substantial monetary penalties against railroads which did not conform to its provisions. Later cases from this Court have authorized equitable relief which has probably had greater impact on state treasuries than did that awarded in *Ex parte Young.* In *Graham* v. *Richardson,* 403 U. S. 365 (1971), Arizona and Pennsylvania welfare officials were prohibited from denying welfare benefits to otherwise qualified recipients who were aliens. In *Goldberg* v. *Kelly,* 397 U. S. 254 (1970), New York City welfare officials were enjoined from following New York State procedures which authorized the termination of benefits paid to welfare recipients without prior hearing.[12] But the fiscal consequences to state

---

[12] The Court of Appeals considered the Court's decision in *Griffin* v. *School Board,* 377 U. S. 218 (1964), to be of like import. But as may be seen from *Griffin's* citation of *Lincoln County* v. *Luning,* 133 U. S. 529 (1890), a county does not occupy the same position as a State for purposes of the Eleventh Amendment. See also *Moor* v. *County of Alameda,* 411 U. S. 693 (1973). The fact that the county policies executed by the county officials in *Griffin* were subject to the commands of the Fourteenth Amendment, but the county was not able to invoke the protection of the Eleventh Amendment, is no more than a recognition of the long-established rule that while county action is generally state action for purposes of the Fourteenth Amendment, a county defendant is not necessarily a state defendant for purposes of the Eleventh Amendment.

treasuries in these cases were the necessary result of compliance with decrees which by their terms were prospective in nature. State officials, in order to shape their official conduct to the mandate of the Court's decrees, would more likely have to spend money from the state treasury than if they had been left free to pursue their previous course of conduct. Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in *Ex parte Young, supra.*

But that portion of the District Court's decree which petitioner challenges on Eleventh Amendment grounds goes much further than any of the cases cited. It requires payment of state funds, not as a necessary consequence of compliance in the future with a substantive federal-question determination, but as a form of compensation to those whose applications were processed on the slower time schedule at a time when petitioner was under no court-imposed obligation to conform to a different standard. While the Court of Appeals described this retroactive award of monetary relief as a form of "equitable restitution," it is in practical effect indistinguishable in many aspects from an award of damages against the State. It will to a virtual certainty be paid from state funds, and not from the pockets of the individual state officials who were the defendants in the action. It is measured in terms of a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials.

Were we to uphold this portion of the District Court's decree, we would be obligated to overrule the Court's holding in *Ford Motor Co.* v. *Department of Treasury, supra.* There a taxpayer, who had, under protest, paid taxes to the State of Indiana, sought a refund of those taxes from the Indiana state officials who were charged with their collection. The taxpayer claimed that the tax

had been imposed in violation of the United States Constitution. The term "equitable restitution" would seem even more applicable to the relief sought in that case, since the taxpayer had at one time had the money, and paid it over to the State pursuant to an allegedly unconstitutional tax exaction. Yet this Court had no hesitation in holding that the taxpayer's action was a suit against the State, and barred by the Eleventh Amendment. We reach a similar conclusion with respect to the retroactive portion of the relief awarded by the District Court in this case.

The Court of Appeals expressed the view that its conclusion on the Eleventh Amendment issue was supported by this Court's holding in *Department of Employment* v. *United States,* 385 U. S. 355 (1966). There the United States was held entitled to sue the Colorado Department of Employment in the United States District Court for refund of unemployment compensation taxes paid under protest by the American National Red Cross, an instrumentality of the United States. The discussion of the State's Eleventh Amendment claim is confined to the following sentence in the opinion:

> "With respect to appellants' contention that the State of Colorado has not consented to suit in a federal forum even where the plaintiff is the United States, see *Monaco* v. *Mississippi,* 292 U. S. 313 (1934), and *Ex parte Young,* 209 U. S. 123 (1908)." *Id.,* at 358.

*Monaco* v. *Mississippi,* 292 U. S. 313 (1934), reaffirmed the principle that the Eleventh Amendment was no bar to a suit by the United States against a State. *Id.,* at 329. In view of Mr. Chief Justice Hughes' vigorous reaffirmation in *Monaco* of the principles of the Eleventh Amendment and sovereign immunity, we think it unlikely that the Court in *Department of Employment* v. *United States,* in citing *Ex parte Young* as well as *Monaco,*

intended to foreshadow a departure from the rule to which we adhere today.

Three fairly recent District Court judgments requiring state directors of public aid to make the type of retroactive payment involved here have been summarily affirmed by this Court notwithstanding Eleventh Amendment contentions made by state officers who were appealing from the District Court judgment.[13]  *Shapiro* v. *Thompson,* 394 U. S. 618 (1969), is the only instance in which the Eleventh Amendment objection to such retroactive relief was actually presented to this Court in a case which was orally argued.   The three-judge District Court in that case had ordered the retroactive payment of welfare benefits found by that court to have been unlawfully withheld because of residence requirements held violative of equal protection.  270 F. Supp. 331, 338 n. 5 (Conn. 1967).  This Court, while affirming the judgment, did not in its opinion refer to or substantively treat the Eleventh Amendment argument.   Nor, of course, did the summary dispositions of the three District Court cases contain any substantive discussion of this or any other issues raised by the parties.

This case, therefore, is the first opportunity the Court has taken to fully explore and treat the Eleventh Amend-

---

[13] Brief for Respondent 15–18.   Decisions of this Court in which we summarily affirmed a decision of a lower federal court which ordered the payment of retroactive awards and in which the jurisdictional statement filed in this Court raised the Eleventh Amendment defense include: *State Dept. of Health and Rehabilitative Services* v. *Zarate,* 407 U. S. 918 (1972), aff'g 347 F. Supp. 1004 (SD Fla. 1971); *Sterrett* v. *Mothers' and Children's Rights Organization,* 409 U. S. 809 (1972), aff'g unreported order and judgment of District Court (ND Ind. 1972) on remand from *Carpenter* v. *Sterrett,* 405 U. S. 971 (1972); *Gaddis* v. *Wyman,* 304 F. Supp. 717 (SDNY 1969) (order at CCH Poverty Law Rep. ¶ 10,506 [1968–1971 Transfer Binder]), aff'd *per curiam sub nom. Wyman* v. *Bowens,* 397 U. S. 49 (1970).

ment aspects of such relief in a written opinion. *Shapiro* v. *Thompson* and these three summary affirmances obviously are of precedential value in support of the contention that the Eleventh Amendment does not bar the relief awarded by the District Court in this case. Equally obviously, they are not of the same precedential value as would be an opinion of this Court treating the question on the merits. Since we deal with a constitutional question, we are less constrained by the principle of *stare decisis* than we are in other areas of the law.[14] Having now had an opportunity to more fully consider the Eleventh Amendment issue after briefing and argument, we disapprove the Eleventh Amendment holdings of those cases to the extent that they are inconsistent with our holding today.

The Court of Appeals held in the alternative that even if the Eleventh Amendment be deemed a bar to the retroactive relief awarded respondent in this case, the State of Illinois had waived its Eleventh Amendment immunity and consented to the bringing of such a suit by participating in the federal AABD program. The Court of Appeals relied upon our holdings in *Parden* v. *Terminal R. Co.*, 377 U. S. 184 (1964), and *Petty* v. *Tennessee-Missouri Bridge Comm'n*, 359 U. S. 275 (1959),

---

[14] In the words of Mr. Justice Brandeis: *"Stare decisis* is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than that it be settled right. . . . This is commonly true even where the error is a matter of serious concern, provided correction can be had by legislation. But in cases involving the Federal Constitution, where correction through legislative action is practically impossible, this Court has often overruled its earlier decisions. The Court bows to the lessons of experience and the force of better reasoning, recognizing that the process of trial and error, so fruitful in the physical sciences, is appropriate also in the judicial function." *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393, 406–408 (1932) (dissenting opinion) (footnotes omitted).

and on the dissenting opinion of Judge Bright in *Employees* v. *Department of Public Health and Welfare,* 452 F. 2d 820, 827 (CA8 1971). While the holding in the latter case was ultimately affirmed by this Court in 411 U. S. 279 (1973), we do not think that the answer to the waiver question turns on the distinction between *Parden, supra,* and *Employees, supra.* Both *Parden* and *Employees* involved a congressional enactment which by its terms authorized suit by designated plaintiffs against a general class of defendants which literally included States or state instrumentalities. Similarly, *Petty* v. *Tennessee-Missouri Bridge Comm'n, supra,* involved congressional approval, pursuant to the Compact Clause, of a compact between Tennessee and Missouri, which provided that each compacting State would have the power "to contract, to sue, and be sued in its own name." The question of waiver or consent under the Eleventh Amendment was found in those cases to turn on whether Congress had intended to abrogate the immunity in question, and whether the State by its participation in the program authorized by Congress had in effect consented to the abrogation of that immunity.

But in this case the threshold fact of congressional authorization to sue a class of defendants which literally includes States is wholly absent. Thus respondent is not only precluded from relying on this Court's holding in *Employees,* but on this Court's holdings in *Parden* and *Petty* as well.[15]

---

[15] Respondent urges that the traditionally broad power of a federal court sitting as a court of equity to fashion appropriate remedies as are necessary to effect congressional purposes requires that the District Court's award of retroactive benefits be upheld. Respondent places principal reliance on our prior decisions in *Porter* v. *Warner Holding Co.,* 328 U. S. 395 (1946), and *Mitchell* v. *DeMario Jewelry,* 361 U. S. 288 (1960). Both cases dealt with the

The Court of Appeals held that as a matter of federal law Illinois had "constructively consented" to this suit by participating in the federal AABD program and agreeing to administer federal and state funds in compliance with federal law. Constructive consent is not a doctrine commonly associated with the surrender of constitutional rights, and we see no place for it here. In deciding whether a State has waived its constitutional protection under the Eleventh Amendment, we will find waiver only where stated "by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." *Murray* v. *Wilson Distilling Co.*, 213 U. S. 151, 171 (1909). We see no reason to retreat from the Court's statement in *Great Northern Life Insurance Co.* v. *Read*, 322 U. S., at 54 (footnote omitted):

> "[W]hen we are dealing with the sovereign exemption from judicial interference in the vital field of financial administration a clear declaration of the state's intention to submit its fiscal problems to other courts than those of its own creation must be found."

The mere fact that a State participates in a program through which the Federal Government provides assistance for the operation by the State of a system of public aid is not sufficient to establish consent on the part of the State to be sued in the federal courts. And while this Court has, in cases such as *J. I. Case Co.* v. *Borak*, 377

---

power of a federal court to grant equitable relief for violations of federal law; the decision in *Mitchell* indicated that a federal court could provide equitable relief "complete . . . in light of the statutory purposes." *Id.*, at 292. Since neither of these cases involved a suit against a State or a state official, it did not purport to decide the availability of equitable relief consistent with the Eleventh Amendment.

U. S. 426 (1964), authorized suits by one private party against another in order to effectuate a statutory purpose, it has never done so in the context of the Eleventh Amendment and a state defendant. Since *Employees, supra,* where Congress had expressly authorized suits against a general class of defendants and the only thing left to implication was whether the described class of defendants included States, was decided adversely to the putative plaintiffs on the waiver question, surely this respondent must also fail on that issue. The only language in the Social Security Act which purported to provide a federal sanction against a State which did not comply with federal requirements for the distribution of federal monies was found in former 42 U. S. C. § 1384 (now replaced by substantially similar provisions in 42 U. S. C. § 804), which provided for termination of future allocations of federal funds when a participating State failed to conform with federal law.[16] This provision by its terms did not authorize suit against anyone, and standing alone, fell far short of a waiver by a participating State of its Eleventh Amendment immunity.

Our Brother MARSHALL argues in dissent, and the Court of Appeals held, that although the Social Security Act itself does not create a private cause of action, the cause of action created by 42 U. S. C. § 1983, coupled with the enactment of the AABD program, and the issuance by HEW of regulations which require the States to make corrective payments after successful "fair hear-

---

[16] HEW sought passage of a bill in the 91st Congress, H. R. 16311, § 407 (a), which would have given it authority to require retroactive payments to eligible persons denied such benefits. The bill failed to pass the House of Representatives. See H. R. 16311, The Family Assistance Act of 1970, Senate Committee on Finance, 91st Cong., 2d Sess., C169–170 (Comm. Print Nov. 5, 1970).

ings" and provide for federal matching funds to satisfy federal court orders of retroactive payments, indicate that Congress intended a cause of action for public aid recipients such as respondent.[17]   It is, of course, true that *Rosado* v. *Wyman*, 397 U. S. 397 (1970), held that suits in federal court under § 1983 are proper to secure compliance with the provisions of the Social Security Act on the part of participating States.[18]   But it has not hereto-

---

[17] Title 45 CFR §§ 205.10 (b) (2) and (3) provide:

"(b) *Federal financial participation.*   Federal financial participation is available for the following items:

.          .          .          .          .

"(2) Payments of assistance made to carry out hearing decisions, or to take corrective action after an appeal but prior to hearing, or to extend the benefit of a hearing decision or court order to others in the same situation as those directly affected by the decision or order.   Such payments may be retroactive in accordance with applicable Federal policies on corrective payments.

"(3) Payments of assistance within the scope of Federally aided public assistance programs made in accordance with a court order."

The Court of Appeals felt that § 1983, the enactment of the AABD program, and the issuance by HEW of the above regulation, indicated that Congress intended to include within the Social Security Act the remedy of "effective judicial review" and "the remedy of restoration of benefits withheld in violation of federal law."   472 F. 2d, at 994–995 and n. 15.   But the adoption of regulations by HEW to permit the use of federal funds in the satisfaction of judicial awards is not determinative of the constitutional issues here presented.

[18] MR. JUSTICE MARSHALL, and both the Court of Appeals and the respondent herein, refer to language in *Rosado* v. *Wyman*, 397 U. S., at 420, to the effect that Congress in legislating the Social Security Act has not "closed the avenue of effective judicial review to those individuals most directly affected by the administration of its program."   The Court in *Rosado* was concerned with the compatibility of a provision of New York law which decreased benefits to some eligible public aid recipients and amendments to the federal act which required cost-of-living increases.   The case did not purport to

fore been suggested that § 1983 was intended to create
a waiver of a State's Eleventh Amendment immunity
merely because an action could be brought under that

decide the Eleventh Amendment issue we resolve today. In finding
the New York law inconsistent with the federal law, Mr. Justice
Harlan stated:

"New York is, of course, in no way prohibited from using only
*state* funds according to whatever plan it chooses, providing it
violates no provision of the Constitution. It follows, however, from
our conclusion that New York's program is incompatible with
§ 402 (a) (23), that petitioners are entitled to declaratory relief and
an appropriate injunction by the District Court against the pay-
ment of *federal* monies according to the new schedules, should the
State not develop a conforming plan within a reasonable period of
time.

"We have considered and rejected the argument that a federal
court is without power to review state welfare provisions or prohibit
the use of federal funds by the States in view of the fact that
Congress has lodged in the Department of HEW the power to cut
off federal funds for noncompliance with statutory requirements.
We are most reluctant to assume Congress has closed the avenue
of effective judicial review to those individuals most directly affected
by the administration of its program. . . . We adhere to *King* v.
*Smith,* 392 U. S. 309 (1968), which implicitly rejected the argument
that the statutory provisions for HEW review of plans should be read
to curtail judicial relief and held Alabama's 'substitute father' regu-
lation to be inconsistent with the federal statute. While *King* did
not advert specifically to the remedial problem, the unarticulated
premise was that the State had alternative choices of assuming the
additional cost of paying benefits to families with substitute fathers
or not using federal funds to pay welfare benefits according to
a plan that was inconsistent with federal requirements." *Id.,* at
420–421.

Respondent urges that this language is "tantamount to a finding
that Congress conditioned the participation of a state in the cate-
gorical assistance program on the forfeiture of immunity from suit
in a federal forum . . . irrespective of the relief sought, [since]
the intent of Congress remains constant." Brief for Respondent
42–43. Petitioner contends that this language, coupled with
the fact that the Court in *Rosado* remanded the case to the District

section against state officers, rather than against the State itself. Though a § 1983 action may be instituted by public aid recipients such as respondent, a federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief, *Ex parte Young, supra,* and may not include a retroactive award which requires the payment of funds from the state treasury, *Ford Motor Co.* v. *Department of Treasury, supra.*

Respondent urges that since the various Illinois officials sued in the District Court failed to raise the Eleventh Amendment as a defense to the relief sought by respondent, petitioner is therefore barred [19] from raising the Eleventh Amendment defense in the Court of Appeals or in this Court. The Court of Appeals apparently felt the defense was properly presented, and dealt with it on the merits. We approve of this resolution, since it has been well settled since the decision

Court to "afford New York an opportunity to revise its program . . . or, should New York choose [not to revise its program], issue its order restraining the further use of federal monies pursuant to the present statute," 397 U. S., at 421–422, indicates that the Court felt that retroactive relief was not a permissible remedy. Brief for Petitioner 17–20. We do not regard *Rosado* as controlling either way since the Court was not faced with a district court judgment ordering retroactive payments or with a challenge based on the Eleventh Amendment.

[19] Respondent urges that the State of Illinois has abolished its common-law sovereign immunity in its state courts, and appears to argue that suit in a federal court against the State may thus be maintained. Brief for Respondent 23. Petitioner contends that sovereign immunity has not been abolished in Illinois as to this type of case. Brief for Petitioner 31–36. Whether Illinois permits such a suit to be brought against the State in its own courts is not determinative of whether Illinois has relinquished its Eleventh Amendment immunity from suit in the federal courts. *Chandler* v. *Dix,* 194 U. S. 590, 591–592 (1904).

in *Ford Motor Co.* v. *Department of Treasury, supra,* that the Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court:

"[The Attorney General of Indiana] appeared in the federal District Court and the Circuit Court of Appeals and defended the suit on the merits. The objection to petitioner's suit as a violation of the Eleventh Amendment was first made and argued by Indiana in this Court. This was in time, however. The Eleventh Amendment declares a policy and sets forth an explicit limitation on federal judicial power of such compelling force that this Court will consider the issue arising under this Amendment in this case even though urged for the first time in this Court." 323 U. S., at 466–467.

For the foregoing reasons we decide that the Court of Appeals was wrong in holding that the Eleventh Amendment did not constitute a bar to that portion of the District Court decree which ordered retroactive payment of benefits found to have been wrongfully withheld. The judgment of the Court of Appeals is therefore reversed and the cause remanded for further proceedings consistent with this opinion.

*So ordered.*

MR. JUSTICE DOUGLAS, dissenting.

Congress provided in 42 U. S. C. § 1983 that:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Con-

stitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

In this class action respondent sought to enforce against state aid officials of Illinois provisions of the Social Security Act, 42 U. S. C. §§ 1381–1385, known as the Aid to the Aged, Blind, or Disabled (AABD) program.[1] The complaint alleges violations of the Equal Protection Clause of the Fourteenth Amendment and also violations of the Social Security Act. Hence § 1983 is satisfied *in haec verba,* for a deprivation of "rights" which are "secured by the Constitution and laws" is alleged. The Court of Appeals, though ruling that the alleged constitutional violations had not occurred, sustained federal jurisdiction because federal "rights" were violated. The main issue tendered us is whether that ruling of the Court of Appeals is consistent with the Eleventh Amendment.[2]

---

[1] Effective January 1, 1974, this AABD program was replaced by a similar program. See 42 U. S. C. §§ 801–805 (1970 ed., Supp. II). The program in Illinois is administered by the Department of Public Aid. Ill. Rev. Stat., c. 23, §§ 3–1 to 3–12 (1973). The former program was funded in part by the State and in part by the Federal Government. 42 U. S. C. §§ 303, 304, 306, 1201–1204, 1206, 1351–1355, 1381–1385.

[2] The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

As the Court, speaking through MR. JUSTICE BRENNAN, said in *Parden* v. *Terminal R. Co.,* 377 U. S. 184, 186: "Although the Eleventh Amendment is not in terms applicable here, since petitioners are citizens of Alabama, this Court has recognized that an unconsenting State is immune from federal-court suits brought by its own citizens as well as by citizens of another State. *Hans* v. *Louisiana,* 134 U. S. 1; *Duhne* v. *New Jersey,* 251 U. S. 311; *Great Northern Life Ins. Co.* v. *Read,* 322 U. S. 47, 51;

Once the federal court had jurisdiction over the case, the fact that it ruled adversely to the claimant on the constitutional claim did not deprive it of its pendent jurisdiction over the statutory claim. *United States* v. *Georgia Pub. Serv. Comm'n,* 371 U. S. 285, 287–288.

In *Ex parte Young,* 209 U. S. 123, a suit by stockholders of a railroad was brought in a federal court against state officials to enjoin the imposition of confiscatory rates on the railroad in violation of the Fourteenth Amendment. The Eleventh Amendment was interposed as a defense. The Court rejected the defense, saying that state officials with authority to enforce state laws "who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action." *Id.,* at 156. The Court went on to say that a state official seeking to enforce in the name of a State an unconstitutional act "comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequence of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States." *Id.,* at 159–160.

As the complaint in the instant case alleges violations by officials of Illinois of the Equal Protection Clause of the Fourteenth Amendment, it seems that the case is governed by *Ex parte Young* so far as injunctive relief is concerned. The main thrust of the argument is that the instant case asks for relief which if granted would affect the treasury of the State.

Most welfare decisions by federal courts have a fi-

*Fitts* v. *McGhee,* 172 U. S. 516, 524. See also *Monaco* v. *Mississippi,* 292 U. S. 313."

nancial impact on the States. Under the existing federal-state cooperative system, a state desiring to participate, submits a "state plan" to HEW for approval; once HEW approves the plan the State is locked into the cooperative scheme until it withdraws,[3] all as described in *King* v. *Smith,* 392 U. S. 309, 316 *et seq.* The welfare cases coming here have involved ultimately the financial responsibility of the State to beneficiaries claiming they were deprived of federal rights. *King* v. *Smith* required payment to children even though their mother was cohabitating with a man who could not pass muster as a

---

[3] The Social Security Act states what a "state plan" must provide. At the time this suit was brought, 42 U. S. C. § 1382 (a) provided: "A State plan for aid to the aged, blind, or disabled, or for aid to the aged, blind, or disabled and medical assistance for the aged, must . . . .

.     .     .     .     .

"(5) provide (A) such methods of administration . . . as are found by the Secretary to be necessary for the proper and efficient operation of the plan . . . ;

.     .     .     .     .

"(8) provide that all individuals wishing to make application for aid or assistance under the plan shall have opportunity to do so, and that such aid or assistance shall be furnished with reasonable promptness to all eligible individuals;

.     .     .     .     .

"(13) include reasonable standards, consistent with the objectives of this subchapter, for determining eligibility for and the extent of aid or assistance under the plan."

Nearly identical provisions are now found in 42 U. S. C. § 802 (a) (1970 ed., Supp. II).

The Secretary of HEW issued mandatory federal time standard regulations. Handbook, Public Assistance Administration, pt. IV, §§ 2200 (b) (3), 2300 (b) (5); 45 CFR § 206.10 (a) (3). Illinois adopted a 30-day standard for aged and blind applicants (Ill. Categ. Assistance Manual § 4004.1) as contrasted to HEW's 60-day period, § 2200, *supra.* It is that conflict which exposes the merits of the controversy.

"parent." *Rosado* v. *Wyman*, 397 U. S. 397, held that under this state-federal cooperative program a State could not reduce its standard of need in conflict with the federal standard. It is true that *Rosado* did not involve retroactive payments as are involved here. But the distinction is not relevant or material because the result in every welfare case coming here is to increase or reduce the financial responsibility of the participating State. In no case when the responsibility of the State is increased to meet the lawful demand of the beneficiary, is there any levy on state funds. Whether the decree is prospective only or requires payments for the weeks or months wrongfully skipped over by the state officials, the nature of the impact on the state treasury is precisely the same.

We have granted relief in other welfare cases which included retroactive assistance benefits or payments. In *State Dept. of Health and Rehabilitative Services* v. *Zarate*, 407 U. S. 918, the sole issue presented to us [4] was whether the Eleventh Amendment barred a judgment against state officers for retroactive welfare assistance benefits or payments. That had been ordered by the lower court and we summarily affirmed, only MR. JUSTICE WHITE voting to note probable jurisdiction. We also summarily affirmed the judgment in *Sterrett* v. *Mothers' & Children's Rights Organization*, 409 U. S. 809, where one of the two questions [5] was whether retroactive payments of benefits violated the Eleventh Amendment. In *Wyman* v. *Bowens*, 397 U. S. 49, we affirmed a judgment

---

[4] The lower court's opinion is found in 347 F. Supp. 1004.

[5] The jurisdictional statement had as its second question the following:

"Whether a federal court is precluded by the Eleventh Amendment to the United States Constitution from ordering a state agency to pay money from the state treasury and from further ordering the state agency to perform certain specified acts which would otherwise be in the discretion of the agency."

where payments were awarded in spite of the argument that the order was an incursion on the Eleventh Amendment.[6] In *Shapiro* v. *Thompson,* 394 U. S. 618, we affirmed a judgment which ordered payment of benefits wrongfully withheld;[7] and while we did not specifically refer to the point, the lower court had expressly rejected the Eleventh Amendment argument.[8]

In *Gaither* v. *Sterrett,* 346 F. Supp. 1095, 1099, whose judgment we affirmed,[9] 409 U. S. 1070, the court said:

> "[T]his court would note that if defendants' position regarding the jurisdictional bar of the Eleventh Amendment is correct, a great number of federal district court judgments are void, and the Supreme Court has affirmed many of these void judgments."

The Court of Appeals for the Seventh Circuit is in line with that view; the opposed view of the Court of Appeals for the Second Circuit in *Rothstein* v. *Wyman,* 467 F. 2d 226, is out of harmony with the established law.

What is asked by the instant case is minor compared to the relief granted in *Griffin* v. *School Board,* 377 U. S. 218. In that case we authorized entry of an order putting an end to a segregated school system. We held, *inter alia,* that "the District Court may, if necessary to prevent further racial discrimination, require the Supervisors to

---

[6] The lower court's opinion is found in 304 F. Supp. 717. Retroactive payments were challenged in question 2 of the jurisdictional statement.

[7] The lower court's opinion is found in 270 F. Supp. 331.

[8] *Id.,* at 338 n. 5. The award of money damages was alleged to be a violation of the Eleventh Amendment in Part V of the jurisdictional statement.

[9] The jurisdictional statement in the *Sterrett* case explicitly urged that the decree below violated the Eleventh Amendment since it would expend itself on the public treasury—the second question in the jurisdictional statement.

exercise the power that is theirs to levy taxes to raise funds adequate to reopen, operate, and maintain without racial discrimination a public school system in Prince Edward County like that operated in other counties in Virginia." *Id.,* at 233. We so held against vigorous contentions of the state officials that the Eleventh Amendment protected the State; and in reply we cited *Lincoln County* v. *Luning,* 133 U. S. 529, and *Kennecott Copper Corp.* v. *State Tax Comm'n,* 327 U. S. 573, 579, to support the proposition that "actions against a county can be maintained in United States courts in order to vindicate federally guaranteed rights." 377 U. S., at 233.

*Griffin* is sought to be distinguished on the ground that a "county" is not the "state" for purposes of the Eleventh Amendment. But constitutionally the county in *Griffin* was exercising state policy as are the counties here, because otherwise the claim of denial of equal protection would be of no avail.

Counties are citizens of their State for purposes of diversity of citizenship. *Bullard* v. *City of Cisco,* 290 U. S. 179; *Moor* v. *County of Alameda,* 411 U. S. 693, 718–719. And they are not States for purposes of 28 U. S. C. § 1251 (a) which gives this Court original and exclusive jurisdiction of: "(1) All controversies between two or more states. . . ." *Illinois* v. *City of Milwaukee,* 406 U. S. 91, 98. But, being citizens of their State, suits against them by another State are in our original but not exclusive jurisdiction under 28 U. S. C. § 1251 (b)(3). *Ibid.* Yet, as agencies of the State whether in carrying out educational policies or otherwise, they are the State, as *Griffin* held, for purposes of the Fourteenth Amendment. And *Griffin,* like the present case, dealt only with liability to citizens for state policy and state action.

Yet petitioner asserts that money damages may not be awarded against state offenses, as such a judgment

will expend itself on the state treasury. But we are unable to say that Illinois on entering the federal-state welfare program waived its immunity to suit for injunctions but did not waive its immunity for compensatory awards which remedy its willful defaults of obligations undertaken when it joined the cooperative venture.[10]

It is said however, that the Eleventh Amendment is concerned, not with immunity of States from suit, but with the jurisdiction of the federal courts to entertain the suit. The Eleventh Amendment does not speak of "jurisdiction"; it withholds the "judicial power" of federal courts "to any suit in law or equity . . . against one of the United States . . . ." If that "judicial power," or "jurisdiction" if one prefers that concept, may not be exercised even in "any suit in . . . equity" then *Ex parte Young* should be overruled. But there is none eager to take the step. Where a State has consented to join a federal-state cooperative project, it is realistic to conclude that the State has agreed to assume its obligations under that legislation. There is nothing in the Eleventh Amendment to suggest a difference between suits at law and suits in equity, for it treats the two without distinction. If common sense has any role to play in constitutional adjudication, once there is a waiver of immunity it must be true that it is complete so far as effective operation of the state-federal joint welfare program is concerned.

---

[10] We settled in *Rosado* v. *Wyman*, 397 U. S. 397, the question whether the grant of authority under the Social Security Act to HEW to cut off federal funds for noncompliance with statutory requirements provides the exclusive procedure and remedy for violations of the Act. We said: "We are most reluctant to assume Congress has closed the avenue of effective judicial review to those individuals most directly affected by the administration of its program." *Id.*, at 420.

We have not always been unanimous in concluding when a State has waived its immunity. In *Parden* v. *Terminal R. Co.*, 377 U. S. 184, where Alabama was sued by some of its citizens for injuries suffered in the interstate operation of an Alabama railroad, the State defended on the grounds of the Eleventh Amendment. The Court held that Alabama was liable as a carrier under the Federal Employers' Liability Act, saying:

> "Our conclusion is simply that Alabama, when it began operation of an interstate railroad approximately 20 years after enactment of the FELA, necessarily consented to such suit as was authorized by that Act," *id.*, at 192.

The Court added:

> "Our conclusion that this suit may be maintained is in accord with the common sense of this Nation's federalism. A State's immunity from suit by an individual without its consent has been fully recognized by the Eleventh Amendment and by subsequent decisions of this Court. But when a State leaves the sphere that is exclusively its own and enters into activities subject to congressional regulation, it subjects itself to that regulation as fully as if it were a private person or corporation." *Id.*, at 196.

As the Court of Appeals in the instant case concluded, Illinois by entering into the joint federal-state welfare plan just as surely "[left] the sphere that is exclusively its own." *Ibid.*

It is argued that participation in the program of federal financial assistance is not sufficient to establish consent on the part of the State to be sued in federal courts. But it is not merely participation which supports a finding of Eleventh Amendment waiver, but

participation in light of the existing state of the law as exhibited in such decisions as *Shapiro* v. *Thompson,* 394 U. S. 618, which affirmed judgments ordering retroactive payment of benefits. Today's holding that the Eleventh Amendment forbids court-ordered retroactive payments, as the Court recognizes, necessitates an express overruling of several of our recent decisions. But it was against the background of those decisions that Illinois continued its participation in the federal program, and it can hardly be claimed that such participation was in ignorance of the possibility of court-ordered retroactive payments. The decision to participate against that background of precedent can only be viewed as a waiver of immunity from such judgments.

I would affirm the judgment of the Court of Appeals.

MR. JUSTICE BRENNAN, dissenting.

This suit is brought by Illinois citizens against Illinois officials. In that circumstance, Illinois may not invoke the Eleventh Amendment, since that Amendment bars only federal court suits against States by citizens of other States. Rather, the question is whether Illinois may avail itself of the nonconstitutional but ancient doctrine of sovereign immunity as a bar to respondent's claim for retroactive AABD payments. In my view Illinois may not assert sovereign immunity for the reason I expressed in dissent in *Employees* v. *Department of Public Health and Welfare,* 411 U. S. 279, 298 (1973): the States surrendered that immunity in Hamilton's words, "in the plan of the Convention," that formed the Union, at least insofar as the States granted Congress specifically enumerated powers. See *id.,* at 319 n. 7; *Parden* v. *Terminal R. Co.,* 377 U. S. 184 (1964). Congressional authority to enact the Social Security Act, of which AABD is a part, former 42 U. S. C. §§ 1381–1385

(now replaced by similar provisions in 42 U. S. C. § 801–804 (1970 ed., Supp. II)), is to be found in Art. I, § 8, cl. 1, one of the enumerated powers granted Congress by the States in the Constitution.   I remain of the opinion that "because of its surrender, no immunity exists that can be the subject of a congressional declaration or a voluntary waiver," 411 U. S., at 300, and thus have no occasion to inquire whether or not Congress authorized an action for AABD retroactive benefits, or whether or not Illinois voluntarily waived the immunity by its continued participation in the program against the background of precedents which sustained judgments ordering retroactive payments.

I would affirm the judgment of the Court of Appeals.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BLACKMUN joins, dissenting.

The Social Security Act's categorical assistance programs, including the Aid to the Aged, Blind, or Disabled (AABD) program involved here, are fundamentally different from most federal legislation.   Unlike the Fair Labor Standards Act involved in last Term's decision in *Employees* v. *Department of Public Health and Welfare,* 411 U. S. 279 (1973), or the Federal Employers' Liability Act at issue in *Parden* v. *Terminal R. Co.,* 377 U. S. 184 (1964), the Social Security Act does not impose federal standards and liability upon all who engage in certain regulated activities, including often-unwilling state agencies.   Instead, the Act seeks to induce state participation in the federal welfare programs by offering federal matching funds in exchange for the State's voluntary assumption of the Act's requirements.   I find this basic distinction crucial: it leads me to conclude that by participation in the programs, the States waive whatever immunity they might otherwise have from federal court

orders requiring retroactive payment of welfare benefits.[1]

In its contacts with the Social Security Act's assistance programs in recent years, the Court has frequently described the Act as a "scheme of cooperative federalism." See, *e. g., King* v. *Smith,* 392 U. S. 309, 316 (1968); *Jefferson* v. *Hackney,* 406 U. S. 535, 542 (1972). While this phrase captures a number of the unique characteristics of these programs, for present purposes it serves to emphasize that the States' decision to participate in the programs is a voluntary one. In deciding to participate, however, the States necessarily give up their freedom to operate assistance programs for the needy as they see fit, and bind themselves to conform their programs to the requirements of the federal statute and regulations. As the Court explained in *King* v. *Smith, supra,* at 316–317 (citations omitted):

> "States are not required to participate in the program, but those which desire to take advantage of the substantial federal funds available for distribution to needy children [or needy aged, blind or disabled] are required to submit an AFDC [or AABD] plan for the approval of the Secretary of Health, Education, and Welfare (HEW). The plan must conform with several requirements of the Social Security Act and with rules and regulations promulgated by HEW."

So here, Illinois elected to participate in the AABD program, and received and expended substantial federal funds in the years at issue. It thereby obligated itself to comply with federal law, including the require-

---

[1] In view of my conclusion on this issue, I find it unnecessary to consider whether the Court correctly treats this suit as one against the State, rather than as a suit against a state officer permissible under the rationale of *Ex parte Young,* 209 U. S. 123 (1908).

ment of former 42 U. S. C. § 1382 (a)(8) that "such aid
or assistance shall be furnished with reasonable prompt-
ness to all eligible individuals." In *Townsend* v. *Swank*,
404 U. S. 282, 286 (1971), we held that participating
States must strictly comply with the requirement that
aid be furnished "to all eligible individuals," and that
the States have no power to impose additional eligibility
requirements which exclude persons eligible for assistance
under federal standards. Today's decision, *ante*, at 659–
660, n. 8, properly emphasizes that participating States
must also comply strictly with the "reasonable prompt-
ness" requirement and the more detailed regulations add-
ing content to it.

In agreeing to comply with the requirements of the
Social Security Act and HEW regulations, I believe that
Illinois has also agreed to subject itself to suit in the
federal courts to enforce these obligations. I recognize,
of course, that the Social Security Act does not itself
provide for a cause of action to enforce its obligations.
As the Court points out, the only sanction expressly
provided in the Act for a participating State's failure to
comply with federal requirements is the cutoff of federal
funding by the Secretary of HEW. Former 42 U. S. C.
§ 1384 (now 42 U. S. C. § 804 (1970 ed., Supp. II)).

But a cause of action is clearly provided by 42 U. S. C.
§ 1983, which in terms authorizes suits to redress depriva-
tions of rights secured by the "laws" of the United States.
And we have already rejected the argument that Congress
intended the funding cutoff to be the sole remedy for
noncompliance with federal requirements. In *Rosado* v.
*Wyman*, 397 U. S. 397, 420–423 (1970), we held that suits
in federal court under § 1983 were proper to enforce the
provisions of the Social Security Act against participating
States. Mr. Justice Harlan, writing for the Court, ex-

amined the legislative history and found "not the slightest indication" that Congress intended to prohibit suits in federal court to enforce compliance with federal standards. *Id.,* at 422.

I believe that Congress also intended the full panoply of traditional judicial remedies to be available to the federal courts in these § 1983 suits. There is surely no indication of any congressional intent to restrict the courts' equitable jurisdiction. Yet the Court has held that "[u]nless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Porter* v. *Warner Holding Co.,* 328 U. S. 395, 398 (1946). "When Congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of the statutory purposes." *Mitchell* v. *DeMario Jewelry,* 361 U. S. 288, 291–292 (1960).

In particular, I am firmly convinced that Congress intended the restitution of wrongfully withheld assistance payments to be a remedy available to the federal courts in these suits. Benefits under the categorical assistance programs "are a matter of statutory entitlement for persons qualified to receive them." *Goldberg* v. *Kelly,* 397 U. S. 254, 262 (1970). Retroactive payment of benefits secures for recipients this entitlement which was withheld in violation of federal law. Equally important, the courts' power to order retroactive payments is an essential remedy to insure future state compliance with federal requirements. See *Porter* v. *Warner Holding Co., supra,* at 400. No other remedy can effectively deter States from the strong temptation to cut

welfare budgets by circumventing the stringent requirements of federal law. The funding cutoff is a drastic sanction, one which HEW has proved unwilling or unable to employ to compel strict compliance with the Act and regulations. See *Rosado v. Wyman, supra,* at 426 (DOUGLAS, J., concurring). Moreover, the cutoff operates only prospectively; it in no way deters the States from even a flagrant violation of the Act's requirements for as long as HEW does not discover the violation and threaten to take such action.

Absent any remedy which may act with retroactive effect, state welfare officials have everything to gain and nothing to lose by failing to comply with the congressional mandate that assistance be paid with reasonable promptness to all eligible individuals. This is not idle speculation without basis in practical experience. In this very case, for example, Illinois officials have knowingly violated since 1968 federal regulations on the strength of an argument as to its invalidity which even the majority deems unworthy of discussion. *Ante,* at 659–660, n. 8. Without a retroactive-payment remedy, we are indeed faced with "the spectre of a state, perhaps calculatingly, defying federal law and thereby depriving welfare recipients of the financial assistance Congress thought it was giving them." *Jordan v. Weaver,* 472 F. 2d 985, 995 (CA7 1972). Like the Court of Appeals, I cannot believe that Congress could possibly have intended any such result.

Such indicia of congressional intent as can be gleaned from the statute confirm that Congress intended to authorize retroactive payment of assistance benefits unlawfully withheld. Availability of such payments is implicit in the "fair hearing" requirement, former 42 U. S. C. § 1382 (a)(4), which permitted welfare recipients to challenge the denial of assistance. The regulations

which *require* States to make corrective payments retro-actively in the event of a successful fair hearing challenge, 45 CFR § 205.10 (a)(18), merely confirm the obvious statutory intent. HEW regulations also authorize federal matching funds for retroactive assistance payments made pursuant to court order, 45 CFR §§ 205.10 (b)(2), (b)(3). We should not lightly disregard this explicit recognition by the agency charged with administration of the statute that such a remedy was authorized by Congress. See *Griggs* v. *Duke Power Co.,* 401 U. S. 424, 433–434 (1971).

Illinois chose to participate in the AABD program with its eyes wide open. Drawn by the lure of federal funds, it voluntarily obligated itself to comply with the Social Security Act and HEW regulations, with full knowledge that Congress had authorized assistance recipients to go into federal court to enforce these obligations and to recover benefits wrongfully denied. Any doubts on this score must surely have been removed by our decisions in *Rosado* v. *Wyman, supra,* and *Shapiro* v. *Thompson,* 394 U. S. 618 (1969), where we affirmed a district court retroactive payment order. I cannot avoid the conclusion that, by virtue of its knowing and voluntary decision to nevertheless participate in the program, the State necessarily consented to subject itself to these suits. I have no quarrel with the Court's view that waiver of constitutional rights should not lightly be inferred. But I simply cannot believe that the State could have entered into this essentially contractual agreement with the Federal Government without recognizing that it was subjecting itself to the full scope of the § 1983 remedy provided by Congress to enforce the terms of the agreement.

Of course, § 1983 suits are nominally brought against state officers, rather than the State itself, and do not

ordinarily raise Eleventh Amendment problems in view of this Court's decision in *Ex parte Young,* 209 U. S. 123 (1908). But to the extent that the relief authorized by Congress in an action under § 1983 may be open to Eleventh Amendment objections,[2] these objections are waived when the State agrees to comply with federal requirements enforceable in such an action. I do not find persuasive the Court's reliance in this case on the fact that "congressional authorization to sue a class of defendants which literally includes States" is absent. *Ante,* at 672. While true, this fact is irrelevant here, for this is simply not a case "literally" against the State. While the Court successfully knocks down the strawman it has thus set up, it never comes to grips with the undeniable fact that Congress has "literally" authorized this suit within the terms of § 1983. Since there is every reason to believe that Congress intended the full panoply of judicial remedies to be available in § 1983 equitable actions to enforce the Social Security Act, I think the conclusion is inescapable that Congress authorized and the State consented to § 1983 actions in which the relief might otherwise be questioned on Eleventh Amendment grounds.

My conclusion that the State has waived its Eleventh Amendment objections to court-ordered retroactive assistance payments is fully consistent with last Term's

---

[2] It should be noted that there has been no determination in this case that state action is unconstitutional under the Fourteenth Amendment. Thus, the Court necessarily does not decide whether the States' Eleventh Amendment sovereign immunity may have been limited by the later enactment of the Fourteenth Amendment to the extent that such a limitation is necessary to effectuate the purposes of that Amendment, an argument advanced by an *amicus* in this case. In view of my conclusion that any sovereign immunity which may exist has been waived, I also need not reach this issue.

decision in *Employees* v. *Department of Public Health and Welfare,* 411 U. S. 279 (1973). As I emphasized in my concurring opinion, there was no voluntary action by the State in *Employees* which could reasonably be construed as evidencing its consent to suit in a federal forum.

> "[T]he State was fully engaged in the operation of the affected hospitals and schools at the time of the 1966 amendments. To suggest that the State had the choice of either ceasing operation of these vital public services or 'consenting' to federal suit suffices, I believe, to demonstrate that the State had no true choice at all and thereby that the State did not voluntarily consent to the exercise of federal jurisdiction . . . ." *Id.,* at 296.

A finding of waiver here is also consistent with the reasoning of the majority in *Employees,* which relied on a distinction between "governmental" and "proprietary" functions of state government. *Id.,* at 284–285. This distinction apparently recognizes that if sovereign immunity is to be at all meaningful, the Court must be reluctant to hold a State to have waived its immunity simply by acting in its sovereign capacity—*i. e.,* by merely performing its "governmental" functions. On the other hand, in launching a profitmaking enterprise, "a State leaves the sphere that is exclusively its own," *Parden* v. *Terminal R. Co.,* 377 U. S., at 196, and a voluntary waiver of sovereign immunity can more easily be found. While conducting an assistance program for the needy is surely a "governmental" function, the State here has done far more than operate its own program in its sovereign capacity. It has voluntarily subordinated its sovereignty in this matter to that of the Federal Government, and agreed to comply with the conditions imposed

by Congress upon the expenditure of federal funds. In entering this federal-state cooperative program, the State again "leaves the sphere that is exclusively its own," and similarly may more readily be found to have voluntarily waived its immunity.

Indeed, this is the lesson to be drawn from this Court's decision in *Petty* v. *Tennessee-Missouri Bridge Comm'n,* 359 U. S. 275 (1959), where the Court found that the States had waived the sovereign immunity of the Commission by joining in an interstate compact subject to the approval of Congress. The Court in *Petty* emphasized that it was "called on to interpret not unilateral state action but the terms of a consensual agreement" between the States and Congress, *id.,* at 279, and held that the States who join such a consensual agreement, "by accepting it and acting under it assume the conditions that Congress under the Constitution attached." *Id.,* at 281–282. Although the congressional intent regarding the sue-and-be-sued clause was by no means certain, the Court held that the surrounding conditions made it clear that the States accepting it waived their sovereign immunity, *id.,* at 280, especially since this interpretation was necessary to keep the compact "a living interstate agreement which performs high functions in our federalism." *Id.,* at 279.

I find the approach in *Petty* controlling here. As even the dissent in that case recognized, *id.,* at 285 (Frankfurter, J., dissenting), Congress undoubtedly has the power to insist upon a waiver of sovereign immunity as a condition of its consent to such a federal-state agreement. Since I am satisfied that Congress has in fact done so here, at least to the extent that the federal courts may do "complete rather than truncated justice," *Porter* v. *Warner Holding Co.,* 328 U. S., at 398, in § 1983 actions authorized by Congress against state welfare authorities, I respectfully dissent.