Pearl WILLIS, Florene Bouges, and Clara Robinson, on behalf of themselves, their minor children, and all persons similarly situated, Plaintiffs,

v.

John LASCARIS, Commissioner, Onondaga County Department of Social Services, Defendants.

No. 79–CV–430.

United States District Court, N. D. New York.

June 11, 1980.

James H. Hughes, Chief Welfare Atty., Syracuse, N.Y., for defendants; Kathryn Z. Davies, Syracuse, N.Y., of counsel.

## MEMORANDUM–DECISION AND ORDER

MUNSON, District Judge.

### I. Introduction

Presently before the Court are two motions by plaintiff food stamp recipients for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure, and for declaratory and injunctive relief to enjoin defendant Commissioner of the county department of social services from reducing the food stamp allowances of plaintiffs and their proposed class, on the grounds that defendant's notice of such reductions does not satisfy the requirements of the Due

Process Clause of the Fourteenth Amendment as guaranteed by 42 U.S.C. § 1983. Plaintiffs also claim that the form of notice used by defendant violates both federal and New York State administrative regulations.

## II. Facts

Plaintiffs Pearl Willis, Florene Bouges, and Clara Robinson, each receive public assistance in the form of food stamps, and funds from either the Aid to Families of Dependent Children Program (AFDC), or Social Security benefits. During the last week of October, 1979, the Onondaga County Department of Social Services, the agency responsible for administering these public assistance programs to the local community, sent all food stamp recipients a notice entitled "Reduction In Food Stamps." The Department's notice informed the food stamp recipients that they "may receive a reduced amount of Food Stamps on November 1, 1979,"[1] and that the "possible" change was "being made because your Public Assistance heat allowance is being added to your Public Assistance grant effective November 1, 1979. Therefore, your Food Stamp net income is increased."[2]

Briefly, the public assistance heat allowance is added to a public assistance household's cash grant every fall to enable it to pay its heating bill. In the summer, this allowance is removed from a household's public assistance allotment. As a result of the addition and subsequent subtraction of the heat allowance every year, a household's income, for purposes of the food stamp program, increases every fall and decreases in the following summer. Since a household's entitlement to food stamps is dependent on its income, the addition of the heat allowance every fall increases the household's income and reduces its entitlement to food stamps.

The Department's notice also explained that if a reduction in food stamps was required, the food stamp recipient could request a hearing on their case. Moreover, if the request for a hearing was made by October 31, 1979, the notice stated that the current rate of the recipient's food stamp grant would be continued. Yet should the Department's decision be found to be correct after the hearing, then the food stamp recipient would owe the Department the value of the food stamps that were paid in excess. The notice stated further that if a request for a hearing was made after October 31, 1979, then the recipient would receive the reduced amount of food stamps until a final determination was made by the Department on their case. Finally, the Department's notice offered the recipient an opportunity to discuss their case with the food stamp office, which, the notice said, could be consulted with to "find out if free legal advice is available."[3] To appreciate the importance of the notice in question, it would be useful to explain how a household qualifies for public assistance, and the relationship between the public assistance and food stamp programs.

In order to qualify for public assistance,[4] the income of an applicant's household is compared to minimum income levels or "standards of need" as set by the particular public assistance program. A family of four in Onondaga County is said to have "basic needs" of $258.00 per month, "shelter needs" of $120.00 a month, and "heat needs" which are calculated over the course of eight months at $50.00 per month. Thus, a family of four with no income from non-public assistance sources is entitled to a "full grant" of $378.00 per month in the summer and $428.00 during the remainder of the year. The difference being attributable to the $50.00 in heat allowance paid over eight months of the year. The food stamp budgeting principles are similar. For example, a destitute family of four is entitled to an allotment of $204.00 per month in food stamps.

---

1. Exhibit A to Plaintiffs' Complaint.

2. *Id.*

3. *Id.*

4. By this term the Court means to include those households which receive Aid to Dependent Children or Home Relief.

In most instances, should a household's income increase during the year, then there would be a corresponding reduction in the household's public assistance grant. To keep abreast of changes in a household's income, and to guarantee the fair dispersal of public assistance funds, a household's income and public assistance benefits are calculated on a month to month basis, *see* 7 C.F.R. 273.10(a), and New York Food Stamp Manual pp. 87–92 [hereinafter referred to as State Manual], or for such period of time as a household's income can be accurately predicted. If the household's income changes in the meantime, recipients are required to report such changes so that their benefits can be recalculated accordingly.

Still, not every form of a household's income will be included in calculating income for purposes of a particular social service program. Generally, for instance, public assistance programs do not consider food stamps as income, and therefore, a household's public assistance grant will not be effected by the fact that it also receives "income" in the form of food stamps. In the food stamp program, however, if a household receives other forms of public assistance, such a grant will be considered "income" when computing that household's food stamp allotment. Thus, a household that is without income except for a public assistance grant, is entitled to a food stamp allotment appropriate for the dollar amount of the household's public assistance grant.

More specifically, a household's food stamp allotment is determined as follows: The household's "gross income" is first computed by totaling the household's income,[5] and then from that figure is subtracted (1) the earned income deduction, which equals twenty per cent of earned income, and (2) a standard deduction of $70.00, and (3) the dependent care deduction. The figure that remains is termed the household's "adjusted income," from which is subtracted the "excess shelter costs deduction." This calculation produces the household's "net food stamp income." Upon subtracting thirty per cent of the "net food stamp income" from the maximum food stamp allotment for a household of the applicant's household's size yields the applicant's food stamp entitlement.[6]

The most complicated budgeting calculations are involved in determining the "excess shelter cost" deduction.[7] The combined "dependent care" and "excess shelter costs" deductions are subject to a maximum of $90.00. Consequently, if a household has monthly dependent care expenses of $90.00 or more, it is entitled to the maximum $90.00 deduction, and there is no need to calculate its "excess shelter costs." But if a household's dependent care expenses are zero, or some other amount less than $90.00, then all or part of the $90.00 maximum will be available as a deduction for "excess shelter costs," which must then be calculated.

"Excess shelter costs" is the amount by which a household's total shelter cost exceed fifty per cent of "adjusted income."

**5.** This does not necessarily include all of a household's income. Thus, for example, child support payments, wage garnishments, certain education loans and grants are not included in the gross income calculation. *See generally* 7 C.F.R. § 273.9(c), and New York State Food Stamp Manual pp. 78–83 [hereinafter referred to as State Manual].

**6.** 7 C.F.R. § 273.10(e). The allotment levels relating to an applicant's "net food stamp income" may be read directly from a "Basis of Issuance Table," *see* State Manual at p. 201.

**7.** 7 C.F.R. § 273.9(d)(4)–(7), and State Manual at pp. 84–86. The regulation provides also for the use of a "standard utility allowance" rather than actual utility expenses in calculating total shelter costs, where use of the standard allowance would be to the household's advantage. 7 C.F.R. § 273.9(d)(5), and State Manual at pp. 85 86. The standard allowances for all parts of New York State except for New York City as of October 1, 1979 were:

*heating/cooling* $106/mo. from October to June, $43/mo. from July to September,

*electric/cooking* $43/mo. for one or two person households, $63/mo. for three or more persons,

*telephone* $10/mo.

Plaintiffs' Supplemental Brief at p. 6 n. 1. The standard allowance for heat "varies seasonably," and should be distinguished from a household's heat allowance. *Id.*

In computing the "excess shelter costs" the Department adds together the household's monthly rent or mortgage payment, its heating bill, its non–heat utility bill, the basic monthly telephone bill, and certain other shelter expenses, and compares this sum to fifty per cent of "adjusted income." If the expenses add up to more than the "adjusted income" figure, the amount of the difference is the "excess shelter cost," which is applied against any amount of the $90.00 maximum deduction which remains available after dependent care expenses have been deducted.

Every fall, when the heat allowance is added to a household's income, a household's food stamp budget changes.[8] First, "unearned income" and "adjusted income" are increased by the amount of the heat allowance. Second, the additional heat allowance income may affect the amount of the "excess shelter costs" deduction because this deduction is computed by reference to fifty per cent of "adjusted income." Third, the new figure for "net food stamp income" will require a recalculation of the household's food stamp allotment. A fourth variable that may effect the household's income and food stamp allotment is the way in which the heat allowance itself is administered. If a household's heat is included in the rent, then that household would not be entitled to the heat allowance. Where a household has a mixed–income, moreover, the welfare department pro–rates the amount of the heat allowance. Also, the heat allowance for any given household will vary depending on its size and whether it uses oil or natural gas.

In sum, twice every year when county–wide heat allowance is added and then subtracted from a household's public assistance grant, the Onondaga County Department of Social Services is required to make a series of recalculations with respect to each recipient of public assistance and food stamps. The defendant estimates that approximately 6,000 households are affected. Conse-

quently, for each of the households, the Department must first determine if the household qualifies for a fuel allowance, and if it does, how much of an allowance the household is entitled to. The Department must next recompute the food stamp budget for each household affected by the heat allowance, including the amount of the "excess shelter costs" deduction.

### III. Allegations of the Parties

Plaintiff's principal allegation is that the form of defendant's notice of "Reduction In Food Stamps" violates the Due Process Clause of the Fourteenth Amendment and 42 U.S.C. § 1983, because it fails to state the amount, if any, a food stamp recipient's allotment will be reduced; does not contain sufficient information to enable recipients to appreciate whether the Department's computation of their food stamp allotment, upon adding the heat allowance, is accurate; fails to adequately explain the reasons for the proposed reduction; and does not apprise the food stamp recipient of what organizations are available in Onondaga County to provide free legal advice. It is further claimed by plaintiffs that these deficiencies in defendant's notice violate federal and state regulations which require notice of "adverse action" to be given to food stamp recipients before their benefits can be reduced or terminated. *See* 7 C.F.R. § 273.13, and Section VII(E) of the New York State Food Stamp Certification Manual. Wherefore, plaintiffs request a preliminary injunction enjoining defendants from reducing the food stamp allotments of any of the named plaintiffs, or the class that they seek to represent, without first giving advance notice of such reductions which is devoid of the above–listed deficiencies.

For its part, defendant argues that the notice of "Reduction In Food Stamps" is constitutionally sufficient because it explains the reason for any possible change in a food stamp recipient's allotment, and the effective date of the change; it informs the food stamp recipient of their administrative

---

8. The impact of the heat allowance on the calculation of a recipient's food stamp allotment is exactly the opposite every summer when the allowance is taken out of a household's public assistance grant.

remedy if the recipient should disagree with the change; it also provides a request form to request a hearing on the food stamp recipient's case; and the notice provides a method for obtaining more information about the possible reduction in a recipient's food stamps and free legal advice. Defendant additionally asserts that the heat allowance is provided pursuant to an eight month disbursement plan under 18 N.Y.C.R.R. § 352.5, which permits the Department to employ an eight or twelve month heat allowance payment plan. When the Department sends out notices to recipients with respect to changes in this plan, defendant maintains that such notices should be considered a "mass change" under 7 C.F.R. § 273.12(e)(2) and the New York State Food Stamp Certification Manual § VII(D), which means that a "notice of adverse action is not required. . . ." Defendant also claims that plaintiffs have not exhausted their administrative remedies by asking for an administrative hearing on their cases, nor have they demonstrated that they will suffer irreparable harm. The plaintiffs' food stamp allotments, says defendant, were properly reduced under federal and state regulations. Defendant argues, in any event, that although plaintiffs' allotments are reduced for part of the year over the course of a twelve month period, plaintiffs will be given their rightful entitlement of food stamps.

### IV. Class Action Certification

■ The first issue to be resolved is plaintiffs' motion for class certification pursuant to Rule 23(b)(1) and (b)(2) of the Federal Rules of Civil Procedure. Plaintiffs assert that they bring this action on behalf of themselves, their minor children, and "all persons residing in Onondaga County who receive both public assistance and food stamps from the local agency in October, 1979, and who are entitled to receive a public assistance fuel–for–heat allowance beginning November 1, 1979." As stated by plaintiffs, this proposed class, in

and of itself, would not satisfy the standing requirement for this action. The substance of the present case concerns the constitutionality of defendant's notice for those households who receive public assistance, and who, as a result of the heat allowance, will receive less food stamps as of November 1, 1979. When the proposed class is narrowed in this manner, the Court believes that the class satisfies Rules 23(a) and (b)(2).

Plaintiffs have satisfied Rule 23(a)(1)'s numerosity requirement because, in defendant's own estimation, the proposed class includes approximately eighteen thousand individuals, or six thousand households. At the same time, and pursuant to Rule 23(a)(2), there are questions of law and fact common to the proposed class in that all will have received the same allegedly unconstitutional notice, and will have had their food stamp allotments reduced. The representatives of the class make this same claim, and therefore satisfy the "typicality" requirement of Rule 23(a)(3). Furthermore, it appears that the representatives' interests are coextensive with the interests of the class as a whole as required by Rule 23(a)(4). It is also the Court's belief that the representatives' counsel will, with ample skill and vigor, adequately protect the interests of the class. Finally, plaintiffs have shown that defendant has "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief [applicable] to the class as a whole." Rule 23(b)(2). Should the Court grant plaintiffs' request for a preliminary injunction, the nature of defendant's supposed harm is such that it will be necessary to fashion relief specifically with regard to the individual members of plaintiffs' proposed class. Thus, plaintiffs have satisfied Rule 23(a) and (b)(2), and the Court grants plaintiffs' motion and certifies their proposed class as amended by the Court.[9] The next issue to be resolved is

9. Defendant also asserts that the Court need not certify plaintiffs' proposed class because "governmental functions are involved and any relief granted would inure to the benefit of all class members." [Answering Affidavit of Kathryn Davies]. In *Hurley v. Ward*, 584 F.2d 609 (2d Cir. 1978), the Second Circuit Court of Appeals held that class certification is unneces-

whether a preliminary injunction should issue to plaintiffs and the class they represent.

## V. Preliminary Injunction

For a preliminary injunction to issue plaintiffs must make a clear showing of (1) probable success on the merits and possible irreparable injury, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balancing of hardships tipping decidedly toward the party requesting preliminary relief. In assessing the balance of hardships, proof of irreparable harm is also required. *New York v. Nuclear Regulatory Commission*, 550 F.2d 745, 750 (2d Cir. 1977).

## A. MERITS

### 1. State Action

■■■■ Plaintiffs have asserted their Fourteenth Amendment due process claim pursuant to 42 U.S.C. § 1983. In order for them to meet the jurisdictional requirement of Section 1983, plaintiffs must first establish that defendant county officer has acted "under color of state law." [10] *In Monell v. Dep't of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that a county and its officers may be sued as "person[s]" under 42 U.S.C. § 1983, for a Constitutional injury inflicted while executing a government policy. The notice at issue in the instant case reflects a government policy and was the "moving force" behind the alleged Constitutional violation suffered by plaintiffs. *See Domiquez v. Beame*, 603 F.2d 337 (2d Cir. 1979). Thus, the Court believes that plaintiffs have demonstrated that their claim meets the juris-

diction requirement of Section 1983, and, as such, is properly before this Court.

### 2. Due Process

■■ It is by now a settled proposition that a household's entitlement to public assistance benefits is a "property interest" which enjoys protection under the Due Process Clause of the Fourteenth Amendment. *Goldberg v. Kelly*, 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970) (welfare assistance); *Banks v. Trainor*, 525 F.2d 837 (7th Cir. 1975) (foodstamps). However, it is less clear what process is due when these benefits are adversely effected by the state. In *Goldberg v. Kelly*, the Supreme Court set forth a balancing test to assist the lower courts in resolving this problem. The Court said:

[t]he extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be "condemned to suffer grievous loss," *Joint Anti–Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 168, 71 S.Ct. 624, 646, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication. Accordingly, as we said in *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961), 'consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.' *See also Hannah v. Larche*, 363 U.S. 420, 440, 442, 80 S.Ct. 1502, 1513, 1514, 4 L.Ed.2d 1307

---

sary when "the state has admitted the identity of issues as to all potential class litigants ...." *Id.* at 611-12. Defendant in the present case has not conceded that an identity of issues exists with respect to all potential members of plaintiffs' class. As a result, the Court does not believe that class certification is unwarranted.

**10.** Defendant would seem to argue that even before the Court considers this issue, it should examine whether plaintiffs have exhausted their administrative remedies. However, Section 1983 plaintiffs are not required to exhaust administrative remedies before they file a civil rights action. *Meyer v. Frank*, 550 F.2d 726 (2d Cir. 1977); *Gill v. Monroe County Dep't of Social Services*, 79 F.R.D. 316 (W.D.N.Y.1978).

(1960). 397 U.S. at 262–63, 90 S.Ct. at 1017–18.[11]

■ In partially explaining the purpose of the balancing test, the Court stated that it is designed to protect the public assistance recipient from erroneous or arbitrary decisions by the government. *Id.* at 266, 90 S.Ct. at 1019.[12] An essential tool in avoiding such decisions is the procedural due process requirement of a timely and adequate notice detailing the reasons for any proposed government action which would adversely affect a public assistant recipient's benefits. *Goldberg v. Kelly*, 397 U.S. at 267–68, 90 S.Ct. at 1020. The interest at stake in the notice requirement is directly related to the due process guarantee of an opportunity to be heard. *Mullane v. Central Hanover Tr. Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). As the Court held in *Mullane v. Central Hanover Tr. Co.* "[t]his right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." *Id.* at 314, 70 S.Ct. at 657.[13] In summarizing these principles in *Mullane,* the Court said that "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 314, 70 S.Ct. at 657.

Thus, in the instant case, the extent of the notice required by due process requires the Court to employ the balancing test outlined in *Goldberg.* In this regard, there can be no doubt that even the slightest change in a household's food stamp allotment threatens the well-being and the dignity of its members. *See Goldberg v. Kelly*, 397 U.S. at 266, 90 S.Ct. at 1019; *Lyons v. Weinberger,* 376 F.Supp. 248, 262–63 (S.D. N.Y.1974). A household's interest in its own survival, at the same time, is not an isolated concern, but is an important concern of our society as a whole. "[P]ublic assistance . . . is not mere charity, but a means 'to promote the general welfare, and secure the Blessings of Liberty to ourselves and our Posterity.' " *Goldberg v. Kelly*, 397 U.S. at 265, 90 S.Ct. at 1019. It must also be recognized that the typical social service recipient stands in a profoundly inferior position in relationship to a government bureaucracy. Often, for example, food stamp recipients may be aged, blind, handicapped, submissive, or unable for some other valid reason to press their claims before the administrative system in a timely and thorough fashion. *See Vargas v. Trainor,* 508 F.2d 485, 489–90 (7th Cir. 1970); *Cf. Goldberg v. Kelly*, 397 U.S. at 264, 90 S.Ct. at 1018. Still, these concerns must be

11. This balancing test was stated slightly differently in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976);

 our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *See, e. g., Goldberg v. Kelly, supra,* at 263–271, 90 S.Ct. at 1018.

 424 U.S. at 334 -35, 96 S.Ct. at 903. The Court stated further: "[i]n assessing what process is due in this case, substantial weight must be given to the good-faith judgments of the individuals charged by Congress with the administration of social welfare programs that procedures they have provided assure fair consideration of the entitlement claims of individuals." *Id.* at 349, 96 S.Ct. at 909.

12. Some commentators have expressed their displeasure with this "error--centered" theoretical grounding of procedural due process. They believe that the pillars of due process rest not only on concepts of utilitarianism, but also on concepts of individual dignity. See Tribe, American Constitutional Law 538--39 (1978); Marshaw, J. The Supreme Court's Due Process Calculus for Administrative Adjudication in *Mathews v. Eldridge*: Three Factors in Search of a Theory of Value, 44 U.Chi.L.Rev. 28 (1976).

13. In *Goldberg* the Supreme Court said that "[t]he opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard." 397 U.S. at 268–69, 90 S.Ct. at 1021.

weighed against the government's interest in conserving fiscal and administrative resources.

■ Upon weighing all of these interests, however, the Court is convinced that Society's interest in general, and the food stamp recipient's plight in particular, form the basis of the recipient's entitlement to the security of some procedural accomodation, especially where the burden on the county fisc would be insignificant. The Court concludes in the present case that defendant's notice of "Reduction In Food Stamps" does not reflect this spirit of accomodation and therefore is violative of the Due Process Clause of the Fourteenth Amendment. An examination of relevant case law supports this view.

*Goldberg's* requirement of a "detailed notice" and the *Mullane* Court's dedication to the principal of an informed choice, have been translated by the lower courts into a shield by which public assistance recipients are able to protect their "opportunity to be heard." In *Vargas v. Trainor*, for example, the court struck down two different state notices of reduction or termination of public assistance benefits as unconstitutional, even though the notices in question detailed the extent of change each public assistance recipient would face. The *Vargas* Court held that because the notices did not explain the reasons for the reductions or terminations, they were unconstitutional. Moreover, despite the fact that in *Vargas*, the state's notices invited the public assistance recipient to ask their case worker about the reasons for the change in their benefits, the Court held that this procedure did not satisfy the due process requirement of "a notice stating the reasons for the proposed action." *Id.* 508 F.2d at 489.

In *Banks v. Trainor*, 525 F.2d 837 (7th Cir. 1976), the Court considered the constitutionality of a notice of reduction of food stamps which informed the food stamp recipients that because of a new method of calculating income, their food stamp allotments were being reduced. The *Banks* court found that this notice was unconstitutional because, although the notice informed the recipient of the amount their food stamps were going to be reduced, these figures were not clearly identified or explained, nor were the reasons for the change given to the food stamp recipients. The Court concluded:

> Both *Goldberg* and *Vargas* require detailed notice of adverse action as a protection against agency error and arbitrariness. Because the calculation of food stamp benefits under the income method requires an individualized determination of income, expenses and deductions for each recipient, due process requires full and adequate written notice.

525 F.2d at 842.[14]

■ These cases offer conclusive support for holding the notice at issue in the present case to be unconstitutional. Bi–annually, the addition and then subtraction of the heat allowance requires the Onondaga County Department of Social Services to recalculate the income of some thousands of households in Onondaga County for purposes of allocating food stamps. As described already, this means that defendant must properly isolate those households which are entitled to the heat allowance and the amount of allowance they are entitled to. Then, the Department must recompute the household's income, expenses, and applicable deductions. While defendant would have the Court believe that this task involves a relatively simple across–the–

14. *See Cardinale v. Mathews*, 399 F.Supp. 1163 (D.D.C.1975) (across the board change in formular for determining income in the Supplemental Security Income Program may raise factual issues in individual cases so as to require individual written notices be given to recipients); *Lyons v. Weinberger*, 376 F.Supp. 248 (S.D.N.Y.1974) (change in formulas for determining income in Supplemental Security Income Program required an adequate notice detailing the reasons for any proposed reduction); *Wheeler v. Montgomery*, No. 48303, October 29, 1971 (N.D.Ca.) (three judge court) (due process requires that the notice telling public assistance recipients that their allotments may be reduced is violative of due process because the recipients were not informed as to exactly what changes will be made in their case, and why the proposed change applies to them).

board change, the Court believes that the calculations involved are no less complicated than those at issue in *Vargas* and *Trainor* and the other cases cited in the footnotes to this opinion.[15] In those cases, as here, social service agencies were required to recompute a household's income and entitlement to public assistance, and notice was given to those recipients in forms very similar to that used by defendant; and in some instances more sophisticated notices were used than the notice employed here. Yet, in each case, the Court found the notice to be unconstitutional, either because it did not properly explain to the recipient the scope of the agency's action concerning their case, or because it did not meaningfully explain the reasons for the agency action to enable the household to exercise its right to be heard on the factual issues raised by that action. In accordance with these decisions, the Court holds that plaintiffs, and the class they represent, have demonstrated probable success on the merits of their claim that defendant's notice of "Reduction In Food Stamps" is violative of their rights under the Due Process Clause of the Constitution as guaranteed by 42 U.S.C. § 1983.

■ The Court, however, does not reach the issue of whether the Due Process Clause requires that a notice of adverse action with respect to a food stamp recipient's allotment must include the names of organizations that would provide the recipient with free legal advice. Plaintiffs have not pursued this argument in their oral or written presentations to the Court, and therefore the Court does not feel obligated to decide this issue. Nevertheless, plaintiffs have claimed that defendant's notice violates federal regulations because it does not inform the food stamp recipient of the availability of free legal advice.

■ Pursuant to 7 C.F.R. § 273.13(2), a notice of adverse action must advise a household of the availability of free legal representation. Defendant's notice does not appear to satisfy either the letter or spirit of this regulation. The notice provides in its last sentence that a food stamp recipient may "[a]lso call the office [Onondaga County Department of Social Services] to find out if free legal advice is available." [Exhibit A to Plaintiffs' Brief]. This statement suggests that there might not be free legal advice available to the food stamp recipient, that the Department would have to research the matter, and that it would only be put to the trouble of doing so upon request. In Onondaga County, however, there are at least two free legal services agencies which, by now, are readily known to defendant. Consequently, the Department's approach is misleading and unnecessary, and federal regulations require that at least one of these organizations should be included in a notice of adverse action.

### B. IRREPARABLE HARM

The second prong of the test for the issuance of a preliminary injunction is whether plaintiffs have shown a likelihood of irreparable injury. Plaintiffs claim that as a result of defendant's unconstitutional notice, they suffer the increased risk of receiving a reduction in their food stamp allotment based on erroneous or arbitrary administrative action. Moreover, plaintiffs maintain that the concomitant harm to themselves and their children that will be caused is irreparable and militates in favor of this Court enjoining any reduction in their food stamp allotments pending defendant's issuance of a constitutionally acceptable notice. Defendant asserts to the contrary that plaintiffs will not suffer any long–term harm by a reduction in food

---

**15.** Defendant asserts, in addition, that the Department's notice was in compliance with federal and state regulations which do not require any notification of "mass changes" in the form of seasonal adjustments to a state's utility standard. 7 C.F.R. § 271.1(n)(2)(i); State Manual at pp. 114–17. This claim is not persuasive in view of the merits of plaintiffs due process argument. Nevertheless, the Court notes that in *Banks v. Trainor*, 525 F.2d 837, 842 (7th Cir. 1975), the Court held that the "mass change" exception does not apply where, as in the present case, relatively complicated individualized calculations are being made by the social service agency.

stamps on November 1, 1979, because such a reduction will be made up every summer by an increase in food stamps when the heat allowance is withdrawn from a recipient household's income. In addition, defendant argues that if the Court enjoins him from reducing plaintiffs' food stamp allotments, plaintiffs will be unjustly enriched. Defendant also cites *Edelman v. Jordon*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), for the tenet that he cannot be ordered to pay retroactive benefits to plaintiffs because the County Department is an adjunct of the State of New York, and, as such, enjoys Eleventh Amendment immunity.

With regard to the eight month payment plan, the Court believes that defendant's argument that, in the long run, plaintiffs will not suffer harm, misstates the facts. The calculation of food stamp allotments are based on a time frame when a household's income can be determined with relative certainty. 7 C.F.R. §§ 273.12(1) and (c); State Manual at pp. 109–114. Thus, if a food stamp recipient's income increases after a few months, for example, that individual may not be entitled to any further food stamp allotment. If this increase in income should take place during the winter months—corresponding to the time when the heat allowance is added to a recipient's income and therefore causing their food stamp allotment to be reduced—then this individual would not be receiving food stamps through the summer, when the heat allowance is withdrawn and food stamp allotments are increased. But as is readily apparent both from the federal and state regulations, and the nature of public assistance, a household is not entitled to an annual allotment of food stamps. As a result, the change in food stamp entitlement at issue in the instant case does not, as defendant asserts, merely reflect the Department's utilization of an eight month payment plan.

Defendant also argues that plaintiffs and the class they represent will be unjustly enriched if he and the Department is enjoined from reducing food stamp benefits. This is hardly a persuasive claim. In this case, defendant could not be characterized as a party innocent of wrongdoing, and therefore entitled to the protection of the Court's equity powers. On the contrary, it is plaintiffs who have shown that defendant has probably violated their Constitutional rights to adequate notice. Certainly, when it appears that defendant is no longer violating plaintiffs' rights, defendant will be entitled to recoup benefits that were overpaid to plaintiffs.

Furthermore, the Court does not discern any real hardship to defendant in requiring him to send out more informative notices of reduction of food stamps. If plaintiffs were given an adequate notice in the first instance, it is quite possible that defendant could have handled questions or objections from food stamp recipients in a more orderly fashion. Also, had plaintiffs been informed by notice of the extent and meaning of the reduction in their food stamps, in many instances defendant's Department would have avoided the time and expense involved in recipients making individual visits.

On the other hand, the Court believes that plaintiffs will suffer irreparable harm if they are not provided with a meaningful notice which explains how and why their food stamp allotment is being reduced. Even a slight change in food stamp allotments effects a public assistance household's ability to procure the necessities of life. *Goldberg v. Kelly, supra*. Although the Constitution requires that the government employ procedures which offer a public assistance recipient a meaningful opportunity to protect their interest, it would seem that defendant has not acted within the Constitution's parameters. In rebuttal, defendant points to the fact that few household's asked for hearings after their food stamps were reduced, which implies, presumably, that plaintiffs and their class do not believe that they have been harmed, or cared enough to pursue a remedy. But this lack of inquiry likely reflects the confusion created by the uninformative nature of defendant's notice, and the resulting inability of the food stamp recipient to appreciate its meaning.

In sum, the risk of error, misjudgment, or arbitrary action in a social service bureaucracy is rather high due to the thousands of people who depend on social services, the complexity of the regulations involved in administering social service programs, and the fact that those administering the programs are human and make mistakes. But the consequence of those mistakes in the social service arena, are more harmful than if they are made in other government programs because the ability of people to survive may be jeopardized. In a just society, even a temporary undetermining of that ability is unacceptable and irreparable.

Defendant cites *Edelman v. Jordon*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), and urges the Court not to order the restoration of plaintiffs benefits because as a government agency which is controlled and in part funded by the State of New York, the Onondaga Department of Social Services enjoys the protection of the Eleventh Amendment, and cannot be required to pay retroactive monetary damages. However, in *Holley v. Lavine*, 605 F.2d 638 (2d Cir. 1979), the Second Circuit Court of Appeals held that local government social service agencies are independent entities of the state and may be sued as such. *Id.* at 644–45. It is, moreover, a recognized remedy in New York State Courts to award retroactive relief in public assistance cases. To do otherwise in this action would permit the County of Onondaga to violate federal rights with financial impunity. *Id.* at 645.

In conclusion, plaintiffs' motions for class certification and for a preliminary injunction are granted. Defendant is hereby enjoined from continuing to reduce the food stamp allotments of plaintiffs and the class they represent below the levels extant on October 31, 1979, until they are provided with advance notice that will comply in all respects with the Due Process Clause of the Fourteenth Amendment, and applicable federal and state regulations. Without reaching the ultimate merits of this case, it would appear that defendant would be able to satisfy the Constitution's requirements, and those of applicable regulations, if he sent out a notice which informed the plaintiff food stamp recipients of the exact amount their food stamp allotment would be reduced. The notice should explain with specificity the reasons for this reduction, including a statement of all income and deductions, an explanation of the particular income and deductions employed, an explanation of how the reduction was computed, and the name of at least one legal services organization that is available to provide free legal advice. The Court stays for thirty days that portion of this order that requires defendant to reinstate plaintiffs food stamp levels to their October 31, 1979 levels. Once plaintiffs are provided with adequate notice, they have the right to petition defendant for a hearing within thirty days of receipt of said notice, or forfeit their right to such hearing.

It is so ordered.