**FLORENCE NIGHTINGALE NURSING HOME, Plaintiff,**

v.

**Barbara B. BLUM, individually and as Commissioner of the New York State Department of Social Services, et al., Defendants.**

No. 80 Civ. 5899 (RO).

United States District Court, S.D. New York.

July 27, 1983.

Reboul, MacMurray, Hewitt, Maynard & Kristol, Beckman Rich, New York City, for plaintiff; Walter F. Bottger, New York City, of counsel.

Robert Abrams, Atty. Gen. of the State of New York, New York City, for defendant Barbara B. Blum; Florence E. Abrams, Judith A. Gordon, Asst. Attys. Gen., New York City, of counsel.

Allen G. Schwartz, Corp. Counsel, New York City, for defendant Stanley Brezenoff; Philip Agree, Michael Sparer, New York City, of counsel.

## OPINION AND ORDER

OWEN, District Judge.

Plaintiff Florence Nightingale Nursing Home ("Nightingale") is a duly licensed, skilled nursing facility and provider of medical services, and a participant in the federal Medicaid program, 42 U.S.C. § 1396, et seq. Defendant Barbara B. Blum (the "State") is the Commissioner of the New York State Department of Social Services. Defendant Stanley Brezenoff (the "City") is the Administrator/Commissioner of the New York City Human Resources Administration. From January 1, 1976 until December 1, 1978, the New York City Human Resources Administration acted as the administering agent of the Medicaid program within its jurisdiction pursuant to the State's delegation of authority.[1] For the remainder of the period covered by plaintiff's complaint, the State directly administered the program. The legal liability of the State for actions taken by the City during its period of administration is at issue in this action.

Plaintiff's claims arise from its participation as a provider of medical services in the Medicaid program. Under that program the federal government allocates funds to participating states in order that those states may channel the allocated monies to provide health care for qualifying individuals. Among the specific uses to which Medicaid money is applied is the reimbursement of certain health-related facilities ("providers") for costs incurred by them in servicing the medical needs of individuals qualified to receive assistance under the program ("recipients").

New York State participates in the Medicaid program. Nightingale participates in the program as a provider and is party to a contractual agreement with the State, known as a Provider Agreement, which together with the federal statute and regulations sets the terms of the relationship between the State and Nightingale. Nightingale, in this action, has sought relief against the State on both contractual and statutory grounds.

At the heart of plaintiff's complaint are two contentions which raise questions under the reimbursement portions of the statute and Provider Agreement. First, plaintiff complains that the State, in contravention of its statutory and contractual duties, has left it to bear the cost of the residual liabilities that arise when a recipient of Medicaid benefits, who is also personally liable for part of the cost of medical services, fails to make good on this debt. As a corollary to this claim, plaintiff asserts that the State has left it with the burden and cost of collecting these obligations. Second, plaintiff contends that both the City and State defendants have wrongfully refused to pay

---

1. Plaintiff has named both the City and the State as defendants on its claims. Initially, the City filed cross-claims against the State alleging that the State should be ultimately liable on any damages which it—the City—was found to owe plaintiff. On April 28, 1983, those cross-claims were settled. Plaintiff is still asserting its claims against both the City and the State.

Nevertheless, because the State's contentions on this motion are largely jurisdictional in nature, the apportionment of liability as between the State and the City is not before me at this time. I therefore will discuss the present motion by referring only to the State except where it is necessary to differentiate between the two.

on duly submitted bills for services it provided to qualifying Medicaid recipients.

Now before me is the motion of the State defendant to dismiss this action, in whole or in part. It contends (1) that subject matter jurisdiction is lacking; (2) that the Eleventh Amendment prohibits federal district courts from taking jurisdiction of so much of plaintiff's action as seeks the retroactive payment of state funds, *e.g., Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); and (3) that even if federal subject matter jurisdiction attaches, plaintiff has failed to state a claim.

Plaintiff's complaint raises complex questions of federal statutory interpretation. Plaintiff, in sum, is seeking a declaration from the Court to the effect that the State defendant is not administering its Medicaid program in conformity with the guidelines set forth by the Medicaid statute, *supra.* Having raised issues pursuant to that statute, the Supremacy Clause of the United States Constitution, and § 1983, plaintiff's federal claims have jurisdictional basis under 28 U.S.C. § 1343. *Cf. Seneca Nursing Home v. Kansas State Board of Social Welfare,* 490 F.2d 1324 (10th Cir.1974) at 1328 (wherein the Court of Appeals considered whether jurisdiction lay to hear an analogous question of law and concluded that the "claims of conflict between the Kansas [State Plan] and the federal statutes ... are not so wholly insubstantial that federal jurisdiction does not exist.")

█ Jurisdiction of plaintiff's complaint is barred to the extent that the Eleventh Amendment prohibits the prosecution of suits seeking the retroactive payment of state funds in the federal courts. *Edelman v. Jordan, supra.*

█ Upon this record, however, it is unclear whether the State will be ultimately liable for total, partial, or any reimbursement or whether such reimbursement is, in fact, chargeable to federal or city funds. Therefore, the State's motion to dismiss on Eleventh Amendment grounds is denied at this time without prejudice to its renewal at a later time upon a more complete record.

Turning to the substantive claims, I find that Nightingale has adequately pleaded claims for relief. The State first contests the so-called N.A.M.I. reimbursement procedure. Certain recipients of Medicaid, although eligible for some assistance under the program, also have financial assets of their own. These assets have been termed Net Available Monthly Income ("N.A.M. I."). Recipients with N.A.M.I. are required by Medicaid to bear part of the cost of the medical services they receive. At issue here is whether the State should be responsible for collecting N.A.M.I. and bearing the loss for uncollected N.A.M.I. or whether the providers should bear those burdens.

New York has not always dealt with the N.A.M.I. question in the way that it does today. Between July 1, 1976 and July 2, 1978, the State and its providers, including Nightingale, treated N.A.M.I. collection in the following manner. The State imposed the initial collection burden on providers but, where a provider was unable to collect the funds due, the State permitted the provider to resubmit its bill and the State then reimbursed the provider for uncollected N.A.M.I. Thus, for that two-year period, the State acted as a guarantor.

On or about July 2, 1979, however, the State changed its procedures. It informed providers, including Nightingale, that they would no longer be reimbursed for uncollected N.A.M.I. Further, the State announced that this new policy would be retroactive to June, 1978 and that it would also apply to any unpaid bills for services rendered prior to that date. Since June, 1978 the State has continued to deduct an amount equal to recipients' N.A.M.I. from reimbursements paid to Nightingale. In those instances where Nightingale has been unable to collect its N.A.M.I., the State has refused and continues to refuse to reimburse it.

█ The State's motion on the N.A.M.I. issue, therefore, poses the following dispute. On the one hand, Nightingale claims that the Medicaid statute requires that providers be reimbursed for their services on a cost-related basis, that is, that the State pay

providers for the reasonable expenses incurred to provide care. On the other hand, the State contends that the Medicaid statute either calls for reimbursement on the basis of recipients' means or is silent on this aspect of the program and leaves to the State the determination of who is to bear the burden of collecting N.A.M.I. Because I find that the statute allocates these burdens to participating states, the motion to dismiss plaintiff's N.A.M.I. claims for failure to state a claim is denied.

The Medicaid statute directs that:

A state plan for medical assistance must ... (13) provide—... (E) effective July 1, 1976, for payment of the skilled nursing facility and intermediate care facility services provided under the plan *on a reasonable cost basis,* as determined in accordance with methods and standards which shall be developed by the State on the basis of the cost-finding methods approved and verified by the Secretary....

42 U.S.C. § 1396a(a)(13)(E) (emphasis added).

In spite of this language, the State argues that § 1396a(a)(13)(E), without more, leaves open the reimbursement question. While I would not dispute that the language of § 1396a(a)(13)(E) is summary in its allocation of the reimbursement burden to the State, it nevertheless clearly calls for a cost-based reimbursement program. Moreover, other sections of the Medicaid statute support this determination. For example, § 1396k provides participating states with certain powers to assist in their collection process.

In addition, numerous provisions in the regulations promulgated by the Department of Health and Human Services indicate that it is the Department's view that states, and not providers, are the guarantors of payment. Thus, 42 C.F.R. § 447.15 states that:

A state plan must provide that the Medicaid agency must limit participation in the Medicaid program to providers who accept, as payment in full, the amount paid by the agency.

*Cf.* 42 C.F.R. §§ 447.201(b), 447.301, 447.302(b), 447.331, and 447.273.

Moreover, while the precise question I decide today has not been ruled on by any other court, the Court of Appeals for the Tenth Circuit has reached a similar conclusion in an analogous case. *Seneca Nursing Home v. Secretary of Social and Rehabilitation Services of Kansas,* 604 F.2d 1309 (10th Cir.1979). There, a dispute arose between a group of nursing homes and the State of Kansas over which of the two was ultimately liable to collect reimbursement payments chargeable to the private resources of welfare recipients. The Court resolved the question in favor of the nursing homes. It explained that:

[the issue] is whether [the state agency] can refuse payment with respect to nursing home charges allegedly attributable to uncollected private liabilities payable from other patient resources. In essence [the state agency] argues that when it has established a formula as to how much the patient should be able to provide from his or her private resources, it agrees to pay only the difference between that sum and the total "reasonable, usual and customary" charges of the nursing home. It argues that the nursing home must demonstrate it has exhausted all efforts, apparently including legal action, in an attempt to obtain the payments the patients are to provide from their own resources before [the state agency] can be required to pay such charges. It is not clear [the state agency] agrees to pay the charges even if all collection efforts fail; but at least the argument appears to be that the state agency is no more than the guarantor of last resort. We are not persuaded.

*Id.* at 1314. While the Court of Appeals in the *Seneca* case was directing its opinion to another facet of the Medicaid reimbursement issue, I find that its reasoning is applicable to this question as well.

Finally, my holding today is consonant with federal policy. Congress created Medicaid to provide medical assistance and rehabilitative and other services to individuals

who have demonstrated both medical and financial need. *See* 42 U.S.C. § 1396. Because the government does not directly provide medical services, Congress, in order to meet these needs, had to both allot funds in lieu of private payments for medical services and find and encourage individuals and institutions to provide the needed medical services. It is this second concern which the Medicaid statute addresses in 42 U.S.C. §´1396a(a)(13)(E) by ensuring that providers will be reimbursed on the basis of their reasonable costs.[2]

Plaintiff's second set of claims arises out of the defendants' failure to timely pay bills which it submitted for medical services it performed. Nightingale alleges that it timely submitted a number of bills to the City and State agencies administering Medicaid which were either lost or delayed in processing. Nightingale claims, moreover, that the State has now refused to pay on those bills. As a partial defense to this claim, the State contends that it had delegated the repayment obligation from January 1, 1976 until on or about December 1, 1978 to the City.

■ Whatever the dealings were between State and City, it is clear that plaintiff has stated a federal claim. Section 1396a(a)(37) states that a state plan for medical assistance must

> provide for claims payment procedures which (a) ensure that 90 per centum of claims for payment ... are paid within thirty days of the date of receipt of such claims and that 99 per centum of such claims are paid within 90 days of the date of receipt....

Should the facts in this case demonstrate to me that the defendants are not in compliance with this section, relief will be appropriate. Moreover, I am not persuaded, as the State would have me be, that the State could repudiate its timely repayment obli-

gations by merely shifting part of its administrative burden to the City. The statute requires participating states to lodge all administrative responsibility for Medicare in a "single State agency." *See* 42 U.S.C. § 1396a(a)(5). Whether or not a state chooses to delegate part of this responsibility to another governmental unit, the statute makes clear that responsibility ultimately remains with the single State agency.

■ This very question was presented to the Massachusetts federal district court, which held:

> it is clear that Title XIX mandates full and prompt payment by states to Medicaid providers for inpatient care. Thus, so long as [a state] participates in the Title XIX Medicaid program, federal law requires that [that state] promptly pay the full actual reasonable costs of inpatient care .... Any failure to do so, regardless of the reason, is a violation of the Social Security Act.

*Massachusetts General Hospital v. Sargent,* 397 F.Supp. 1056, 1062 (D.Mass.1975). Finally, plaintiff has adequately pleaded its state contract law claim on its two-year-old bills arising out of the Provider Agreement over which I have pendent jurisdiction. I therefore find that plaintiff states a claim upon which relief can be granted.

Submit order on notice.

---

2. The legislative history addresses the need to encourage medical institutions to participate in the plan, as well. Speaking generally of the provisions of the plan that govern state payments to providers, the Senate Report states, "these provisions give reassurance that the hospital bill incurred by a needy individual *shall be paid in full* under the provisions of the State plan ... and that States may not expect to require the individual to use his income or resources (except such income as exceeds the State's maintenance level) toward that bill." S.R. No. 404, 89th Cong. 1st Sess. 87 (1965), U.S.Code Cong. & Admin.News, p. 1943.