*In re* CONSOLIDATED OBJECTIONS TO TAX LEVIES OF SCHOOL DISTRICT No. 205, For the Years 1991 Through 1996 (People Who Care, Intervenors-Appellants, v. Tax Objectors, Appellees).

Second District    No. 2—98—0706

Opinion filed August 18, 1999.

Robert C. Howard and Joan Matlack, both of Futterman & Howard, and James G. Bradtke and Dana L. Kurtz, both of Soule & Bradtke, both of Chicago, for appellant.

Michael F. O'Brien, of McGreevy, Johnson & Williams, P.C., of Rockford, for appellee Tax Objectors.

Thomas J. Lester and Stephen R. Swofford, both of Hinshaw & Culbertson, of Chicago, for appellee Rockford Board of Education School District No. 205.

Marilyn F. Johnson and William A. Morgan, both of Chicago, for *amicus curiae* Board of Education of the City of Chicago.

Mark S. Melickian and Stuart E. Thiel, both of Mayer, Brown & Platt, of Chicago, for *amici curiae* American Civil Liberties Union of Illinois, Chicago Lawyers' Committee for Civil Rights, and Mexican American Legal Defense & Educational Fund.

JUSTICE McLAREN delivered the opinion of the court:

This matter comes before the court as an interlocutory appeal pur-

suant to Supreme Court Rule 308 (155 Ill. 2d R. 308). Nine cases brought by the tax objectors challenging the 1991-96 real estate taxes levied by the Rockford Board of Education District No. 205 (the district) under the Local Governmental and Governmental Employees Tort Immunity Act (the Act) (745 ILCS 10/1—101 *et seq.* (West 1996)) have been consolidated, and certified questions have been sent to this court. The trial court granted summary judgment on motions filed by the tax objectors and denied summary judgment to the district and intervenors. This court denied permissive interlocutory appeal, as did our supreme court. However, the supreme court entered a supervisory order vacating this court's denial of interlocutory appeal and directing this court to allow the appeal and to answer the certified questions on the merits.

The intervenors herein, the People Who Care (the PWC or intervenors), were plaintiffs in a school desegregation and educational discrimination class action for equitable relief brought against the district in federal district court in 1989. Prior to full adjudication on the merits, the PWC and the district entered into two interim agreements temporarily resolving certain contested motions by the PWC. The first interim order, entered in July 1989, modified a reorganization plan adopted by the district. The second interim order, entered in April 1991, required the district to undertake certain preliminary remedial activities for the PWC's benefit. The federal court at that time found that the district was authorized to use the Act to fund the required activities, and the district did levy taxes under the Act. Following a trial on the merits before a magistrate judge, in which the court found that the district engaged in system-wide intentional segregation and discrimination, an order was entered on March 29, 1994, directing the district to eliminate all vestiges of discrimination against black and Hispanic students. The court awarded no money damages, only injunctive relief. Eventually, the magistrate judge entered a "Comprehensive Remedial Order" requiring the district to implement and fund detailed, system-wide remedies, including student assignment remedies, education programs, and long-term capital improvements. Throughout this time, beginning with the first interim order, funds to implement remedial programs were raised by taxes levied and bonds issued under the Act.

Tax objectors filed tax objections beginning in 1991. The district intervened in the proceedings and had the cases removed to federal court, where the district court denied the 1991-93 tax objections on the merits. The Seventh Circuit Court of Appeals reversed on the ground that the cases should not have been removed to federal court and remanded the cases to the state court. See *In re Application of*

*County Collector*, 96 F.3d 890 (7th Cir. 1996). Tax objections for subsequent years were also sent back to the state court.

In the trial court, the proceedings were bifurcated into determining whether the tax levies were authorized under the Act and determining issues relating to procedural defenses and calculation of refunds. After briefing by the parties, the court, in two separate opinions, granted major issue summary judgment to the objectors, holding that the Act was improperly used to pay for remedial measures implemented under the second interim order and after the finding of liability. The PWC was granted leave to intervene when the district did not seek interlocutory review. The trial court then certified the following questions pursuant to Supreme Court Rule 308 (155 Ill. 2d R. 308):

> "(a) Whether the Rockford School District (the 'District') was authorized by the Illinois Local Government Employees Tort Immunity Act ('the Tort Immunity Act') to levy taxes to fund remedies agreed to by the District and/or ordered by the Federal Court in *People Who Care v. Rockford Board of Education* 89 C 20168 ('the *People Who Care* case'):
>> (i) in a 1991 consent decree;
>> (ii) after the District was adjudicated guilty in 1994 and enjoined generally to provide a comprehensive remedy; and/or
>> (iii) after a Comprehensive Remedial Order was entered in 1996 and the District was expressly ordered by the Federal Court to use the Tort Immunity Act levy to fund the remedies (including FY 97 remedial programs and Certificates of Participation)?
>
> (b) Whether the District was authorized by the Tort Immunity Act to levy taxes to pay the debt service on general obligation bonds issued to fund capital improvement remedies agreed to by the District or ordered by the Federal Court in the *People Who Care* case?
>
> (c) Whether taxpayers are precluded from challenging any of the aforesaid taxes under principles of *res judicata* or collateral estoppel?"

■ On review, this court's examination in an interlocutory appeal is strictly limited to the questions certified by the trial court and, as with all questions of law, is a *de novo* review. *Lanxon v. Magnus*, 296 Ill. App. 3d 377, 379 (1998).

■ Article IX of the Act provides for the payment of claims and judgments. Section 9—102 provides:

> "A local public entity is empowered and directed to pay any tort judgment or settlement for *compensatory damages* for which it or an employee while acting within the scope of his employment is li-

able in the manner provided in this Article. All other provisions of this Article, including but not limited to the payment of judgments and settlements in installments, the issuance of bonds, the maintenance of rates and charges, and the levy of taxes shall be equally applicable to judgments or settlements relating to both a local public entity or an employee and those undertakings assumed by a local public entity in intergovernmental joint self-insurance contracts. A local public entity may make payments to settle or compromise a claim or action which has been or might be filed or instituted against it when the governing body or person vested by law or ordinance with authority to make over-all policy decisions for such entity considers it advisable to enter into such a settlement or compromise." (Emphasis added.) 745 ILCS 10/9—102 (West 1996).

Section 9—107 then authorizes local public entities to levy taxes on all taxable property within its territory to be "used for the purposes of this Section and of Section 9—102, 9—103, 9—104 or 9—105, as the case may be." 745 ILCS 10/9—107 (West 1996). Taxes levied under section 9—107 are "exclusive of and in addition to the amount of tax that [an] entity is now or may hereafter be authorized to levy for general purposes under any statute which may limit the amount of tax which that entity may levy for general purposes." 745 ILCS 10/9—107 (West 1996).

▪ The complaint in the underlying federal case stated that the PWC sought equitable and declaratory relief. The civil cover sheet, docketed at the same time, shows that the PWC sought injunctive relief, with no monetary demand. The fundamental question of this case is whether the equitable and declaratory relief realized in this case constituted "compensatory damages" under the Act so that the district may levy taxes under the Act to pay for the court-ordered remedial measures.

At common law, the only remedy for a tort was money damages. *Levy v. McKiel*, 185 Ill. App. 3d 240, 244 (1989) (McLaren, J., dissenting). However, the doctrine of sovereign immunity held that governmental units were immune from tort liability. *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335, 344 (1998). Our supreme court abolished the sovereign immunity of municipal corporations in tort actions in *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill. 2d 11 (1959). The General Assembly subsequently enacted the Act in 1965, adopting the general principle from *Molitor* that local governmental units are liable in tort except in the instances in which a list of immunities contained in the Act limited this liability. *Harinek*, 181 Ill. 2d at 344. The Act codified the common law. *Romano v. Village of Glenview*, 277 Ill. App. 3d 406, 411 (1995). Article XIII, section 4, of

the Illinois Constitution of 1970 further ratified this position by stating that "[e]xcept as the General Assembly may provide by law, sovereign immunity in this State is abolished." Ill. Const. 1970, art. XIII, § 4. Thus, the basic rule in Illinois is that units of local government are subject to tort liability on the same basis as private tortfeasors unless the General Assembly, through valid legislation, imposes conditions upon that liability. *Harinek*, 181 Ill. 2d at 345.

We look at the Act, then, to determine whether the legislature has imposed any condition upon the liability of local governmental units regarding claims for injunctive relief. Section 2—101 of the Act clearly states in part that "[n]othing in this Act affects the right to obtain *relief other than damages* against a local public entity or public employee." (Emphasis added.) 745 ILCS 10/2—101 (West 1996). Case law in this state has long held that injunctive relief is relief other than damages (see *Anderson v. Sutter*, 119 Ill. App. 3d 1070, 1075 (1983)) and thus is not subject to the requirements of the Act. See *River Park, Inc. v. City of Highland Park*, 295 Ill. App. 3d 90, 95 (1998), *aff'd in part & rev'd in part on other grounds*, 184 Ill. 2d 290 (1998)); *Romano*, 277 Ill. App. 3d at 411; *Midwest Bank & Trust Co. v. Village of Lakewood*, 113 Ill. App. 3d 962, 973 (1983). The United States Supreme Court has also held that states are not immune to claims for injunctive relief. In *Edelman v. Jordan*, 415 U.S. 651, 39 L. Ed. 2d 662, 94 S. Ct. 1347 (1974), the plaintiffs sought prospective injunctive relief and money damages from the State of Illinois for disability payments improperly withheld. The Supreme Court held that the suit was barred by the state's eleventh amendment immunity (U.S. Const., amend. XI) to the extent that it sought *retroactive* payments of the withheld disability benefits (*i.e.*, money damages). *Edelman*, 415 U.S. at 669, 39 L. Ed. 2d at 676, 94 S. Ct. at 1358. However, the Court found the suit proper to the extent that it sought the payment of state funds as a consequence of *future* compliance under the injunctive relief sought. *Edelman*, 415 U.S. at 668, 39 L. Ed. 2d at 675, 94 S. Ct. at 1358. The Court subsequently characterized the barred monetary award in *Edelman* as "individual citizens' conducting a raid on the state treasury for an accrued monetary liability." *Milliken v. Bradley*, 433 U.S. 267, 290 n.22, 53 L. Ed. 2d 745, 762 n.22, 97 S. Ct. 2749, 2762 n.22 (1977). Here, there is no award of compensatory damages to any plaintiffs; "tort immunity" is not called into play to prevent a plaintiff's raid of the treasury. The PWC was awarded declaratory and injunctive relief only. The costs of future compliance with the injunctive relief are neither barred nor affected by a "tort immunity." Such injunctive relief has never been affected by the Act. Thus, the Act has no application to the intervenors' case, and it cannot now be used to affect the funding of the injunctive and declaratory relief.

Section 9—102 of the Act empowers local public entities to "pay any tort judgment or settlement for compensatory damages for which it *** is liable in the manner provided in this Article." 745 ILCS 10/9—102 (West 1996)). Unable to cite any Illinois case that has held that injunctive relief is subject to the Act, the intervenors attempt to enlarge the definition of "compensatory damages" as used in section 9—102 of the Act to include the relief sought in this case. Relying on *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90 (1992), intervenors argue that the term "damages," given its "plain, ordinary, and popular meaning," "connotes money one must expend to remedy an injury for which he or she is responsible, irrespective of whether that expenditure is compelled by a court of law in the form of compensatory damages or by a court of equity in the form of compliance with mandatory injunctions" (*Outboard Marine*, 154 Ill. 2d at 115-16). However, *Outboard Marine* is distinguishable from the case before us and, in the final analysis, is contrary to the intervenors' position. *Outboard Marine* involved the scope of coverage of a comprehensive general liability insurance policy. The court looked at the nature of the policy and the common, dictionary definition of "damages" to ascertain the intent of the parties as to what types of damages the policy could cover. See *Outboard Marine*, 154 Ill. 2d at 115-17. The court concluded that, in light of the comprehensive nature of the policy and the popular meaning of "damages," the parties intended the policy to cover liability *regardless of whether the liability was legal or equitable in nature. Outboard Marine*, 154 Ill. 2d at 117.

*Outboard Marine* did not involve the Act. Its analysis did not involve the interpretation of a statute but the interpretation of a specific insurance policy between two contracting parties. The court's conclusion, reached "under the facts of [the] case" (*Outboard Marine*, 154 Ill. 2d at 117), that "damages" includes both legal and equitable relief does not transfer across all legal areas, as appellants argue. The holding of *Outboard Marine* is limited in scope and not applicable to the interpretation of the Act.

The court in *Outboard Marine* did note, however, that "[i]f the insurer had desired to restrict coverage to only those suits seeking legal, compensatory damages, it could have easily included among its exclusionary provisions an exclusion pertaining to the costs of complying with mandatory injunctions." *Outboard Marine*, 154 Ill. 2d at 117. In the case before us, the legislature has included within the Act an exclusion pertaining to the costs of complying with mandatory injunctions. It expressly limited payments under the Act to payments for "compensatory damages." See 745 ILCS 10/9—102 (West 1996). Furthermore, the court in *Outboard Marine* differentiated between

compensatory damages and injunctive relief. In defining damages, the court found that "to most people, to ordinary laypersons, 'damages' connotes money one must expend to remedy an injury for which he or she is responsible, *irrespective of whether that expenditure is compelled by a court of law in the form of compensatory damages or by a court of equity in the form of compliance with mandatory injunctions.*" (Emphasis added.) *Outboard Marine,* 154 Ill. 2d at 116. Thus, according to our supreme court, compensatory damages and injunctive relief are not the same.

A settlement or judgment resulting in compensatory damages has some definite amount due, so that all parties will know when compliance is complete. It is not open but definite and certain. The relief granted in the underlying case herein has no definite dollar amount. No one can say at this point what must be done before the district is in compliance. No one knows how much revenue must be raised and paid out before the district will be in compliance. We cannot conclude that the legislature planned to have this type of open-ended relief financed by the unregulated ability to tax that is contemplated by the Act. The intervenors argue that the court's oversight of the case ensures that the ability to tax will not be abused. However, not all instances of taxation under the Act will have such oversight, and, even with oversight, there is no assurance that abuses will not occur. Judges are not perfect; if they were, there would be no need or purpose to establish courts of review. If the PWC and the district had settled their dispute before a complaint was filed, there would be no oversight of the district's tax levy and spending. The raid on the public treasury in this case is conducted, not by individuals, as in *Edelman,* but by the government itself. The Act is not meant to fund this type of relief.

Intervenors also contend that recent legislative actions demonstrate that the Act has always contemplated the funding of injunctive relief. Several times in the recent past, the legislature has voted down amendments to the Act to prohibit funding of remedies such as that at issue here. Most recently, in the 1999 session, the legislature defeated a proposal to prohibit school districts from raising funds under the Act to pay the costs of construction. Intervenors argue that, since the legislature has declined to amend the Act to prohibit funding of injunctive remedies, the Act must therefore allow such funding. However, this argument is not persuasive. Illinois courts have long held that the Act did not authorize the funding of injunctive relief. See *e.g., Anderson,* 119 Ill. App. 3d at 1075. One cannot read anything into the legislature's failure to codify that which the courts have long held. However, one can infer that the legislature agrees with the court's interpretation of the Act from the legislature's failure to introduce, let

alone pass, any amendment to the Act that would *authorize* funding of injunctive relief.

Intervenors note that the legislature has passed an amendment to section 9—107 of the Act (745 ILCS 10/9—107 (West 1996)) that, if signed into law, would add in part the General Assembly's finding that "the purpose of this Section [9—107] is to provide an extraordinary tax for funding expenses relating to tort liability, insurance, and risk management programs." 91 Ill. Gen. Assem., Senate Bill 941, 1999 Sess. According to intervenors, this shows a broad legislative intent that any expense relating to tort liability, not just compensatory damages, should be funded under the Act. However, this amendment has not yet been signed into law and, even if it were, it would not be applied retroactively, as intervenors concede. Furthermore, the concern of the legislature in passing the amendment is that "some units of local government are using the tax revenue to fund expenses more properly paid from general operating funds. These uses of the revenue are inconsistent with the limited purpose of the tax authorization." 91 Ill. Gen Assem., Senate Bill 941, 1999 Sess. Thus, the legislature set forth, as a matter of policy, "that (i) the use of the tax revenue authorized by this Section for purposes not expressly authorized under this Act is improper and (ii) the provisions of this Section shall be strictly construed consistent with this declaration and the Act's express purposes." 91 Ill. Gen. Assem., Senate Bill 941, 1999 Sess. This amendment *is not* a broadening of the Act. It shows a legislative policy that the Act, which has a limited purpose, is not to be constantly expanded to find new ways to spend money raised under the Act. The recent legislative amendment does not strengthen the intervenors' position.

Intervenors also argue that compelling public policy reasons exist for adopting an interpretation of the Act that includes funding for injunctive remedies. It would appear the intervenors seek to avoid the procedures set out in *Missouri v. Jenkins*, 495 U.S. 33, 109 L. Ed. 2d 31, 110 S. Ct. 1651 (1990), under which a federal court may set aside state law limitations on a local taxing authority when it is necessary to pay for remedying federal constitutional violations. The intervenors argue that, by interpreting the Act in their favor, this court will avoid unnecessary federal interference in state and local government, facilitate prompt vindication of citizens' rights, promote governmental accountability, and avoid the waste of tremendous amounts of time and energy in raising revenues through other methods. While these may be laudable ends to be achieved, they cannot be reached at the expense of the law. Other methods of raising revenue, such as the placing of tax referenda before the citizens of the district, already exist. If the local efforts fail, federal remedies exist under *Jenkins*. If federal

intervention pursuant to *Jenkins* is required, then the parties must take all the steps required to reach a *Jenkins* intervention. This court may not exalt expediency over established state law. The threat of further federal intervention cannot alter the application of a law contrary to the intent of the state legislature as has been ascertained both through the language of the statute and the long-standing interpretation by the Illinois judiciary.

Intervenors also urge this court to give due deference to the decisions of the federal district court in interpreting the Act. Federal decisions construing Illinois law, while not binding on Illinois courts, are persuasive. *Huck v. Northern Indiana Public Service Co.*, 117 Ill. App. 3d 837, 840 (1983). While we have considered the federal bench's interpretations of the Act, we do note that these interpretations are contrary to the line of cases previously cited in which Illinois courts have concluded that injunctive remedies may not be funded under the Act. These state cases are binding and, we believe, correctly reasoned. We will not overrule them. Therefore, we answer certified question "(a)" in the negative.

■ Question "(b)" involves the levying of taxes pursuant to the Act to pay the debt service on general obligation bonds issued to fund capital improvement remedies. Intervenors contend that such a tax levy is authorized under section 9—105 of the Act, which authorizes a local taxing entity to:

"[I]ssue general obligation or revenue bonds without referendum for the purpose of creating a reserve for or for the payment of any cost, liability or loss against which such entity may protect itself or self-insure pursuant to Section 9—103 or for the payment of which such entity may levy a tax pursuant to Section 9—107, including any or all tort judgments or settlements entered against or entered into by the entity ***." (745 ILCS 10/9—105 (West 1996)).

Section 9—107, in turn, authorizes entities to levy taxes for settlements or judgments under section 9—102. See 745 ILCS 10/9—107 (West 1996). However, as we have already determined, the type of open-ended injunctive relief ordered in this case is not compensatory damages under section 9—102 and therefore is not capable of being funded under the authority of the Act. The methods provided in article IX, including the issuance of bonds under section 9—105 and the levying of taxes to pay off the bonds under section 9—107, are not available to the district in this instance. We therefore answer certified question "(b)" in the negative.

Certified question "(c)," regarding *res judicata* and collateral estoppel, has not been briefed by the parties. We therefore decline to address this issue and find it waived.

1114

For the foregoing reasons, we answer the certified questions in the negative.

Certified questions answered.

BOWMAN, P.J., and INGLIS, J., concur.